# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

|  |  |  |
|---|---|---|
| **Herbert A. IGBANUGO, Esq.** | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| | ) | |
| **v.** | ) | Case No. |
| | ) | Case Type: Civil |
| **Minnesota Office of Lawyers Professional Responsibility (OLPR); Susan HUMISTON, in her official capacity as Director of OLPR; Amy HALLORAN, individually and in her official capacity as Assistant Director at OLPR; Jennifer BOVITZ, individually and in her official capacity as Managing Attorney at OLPR; Lawyers Professional Responsibility Board (LPRB); Jeannette BOERNER, individually and in her professional capacity as Attorney Member at LPRB; Tommy KRAUSE, individually and in his professional capacity as Designated Board Member at LPRB; Wilson Law Group; David Lee WILSON, individually and in his official capacity as Founder and Managing Attorney at Wilson Law Group; Michael GAVIGAN, individually and in his official capacity as Senior Attorney at Wilson Law Group; Cassondre BUTEYN, individually and in her official capacity as Co-Owner and Lead Attorney at Wilson Law Group; Eva RODELIUS, individually and in her official capacity as Senior Attorney at** | ) | **Verified Complaint for Declaratory and Injunctive Relief** |

**Wilson Law Group; Aust** )
**SCHMIECHEN, P.A.; Brian AUST,** )
**individually and in his official capacity** )
**as Purported Expert Witness in the** )
***Onofre* Case and as Founding Partner** )
**of Aust Schmiechen, P.A.** )
 )
                        ***Defendants.*** )

To: Defendants named above and their respective attorneys.

## I.   INTRODUCTORY STATEMENT

1. This ***defensive*** action arises from a long pattern of harassment, under the guise of ethics investigations, designed to deprive Plaintiff of his federal, constitutionally protected civil rights. The Complaint seeks redress from the unconstitutional, abusive and oppressive conduct of Minnesota State Bar Association's Office of Lawyers' Professional Responsibility (OLPR) – specifically, Assistant Director Amy M. Halloran - and Lawyer's Professional Responsibility Board (LPRB) that deprives Plaintiff of his rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

2. Plaintiff prays to this Honorable U.S. Federal District Court for protection by way of declaratory and injunctive relief against the OLPR & LRPB for civil rights violations not unconnected with their outright refusal to investigate and sanction co-Defendants Mr. David Lee Wilson, other members of the Wilson Law group and purported expert Mr. Brian Aust for a plethora of ethics violations in the *Onofre* civil lawsuit, (District Court: *Onofre Cedillo et al. V. Herbert Igbanugo et al*, No: 27-CV-16-7603; Court of Appeals: *Onofre Cedillo et al V. Herbert Igbanugo et al.*, 2019 Minn. App. Unpub. LEXIS 451; 2019 WL 2168766; Supreme Court: *Onofre Cedillo et al. V. Herbert*

*Igbanugo et al.* 2019 Minn. LEXIS 526 (Minn., Aug. 20, 2019))[1] as well as related frivolous OLPR complaint. Plaintiff seeks injunctive relief, to compel the OLPR/LPRB (Ms. Amy M. Halloran) to stop violating his civil rights and to kindly pry their/her knees off his neck.

3.  As to David Lee Wilson, his associates Michael Gavigan, Cassondre Buteyn, Eva Rodelius and his Wilson Law Group, and purported expert Brian Aust (Mr. Wilson et. al.), Plaintiffs seek a declaratory judgement that they have engaged in sanctionable vexatious litigation, abuse of court process, and filing multiple meritless ethics complaints against Plaintiff pursuant to a decade plus old vendetta, seeking to mar his legal career and dispossess him of his livelihood with what appears to be the tacit and/or constructive complicity of OLPR/LPRB. Plaintiff seeks and deserves vindication and redress from the false filth spewed in Mr. Wilson's complaint in the *Onofre* civil litigation (and related post-trial ethics complaint to OLPR), and which Mr. Wilson and his firm pursued to the end knowing his claims and allegations to be untrue.

4.  Lawyers are required to follow a strict code of professional responsibility established by the State Bar Association. According to the American Bar Association's Model Rules of Professional Conduct, a lawyer is prohibited from making "a false statement of fact or law to a tribunal." Further, lawyers are prohibited from making assertions in court or in their filings "unless there is a basis in law or fact for doing so that is not frivolous." A failure to follow these rules will usually invite loss of licensure and an imposition of sanctions – including monetary - by the court.

---

[1] Plaintiff does not challenge any of the decisions of the Minnesota State District Court, Court of Appeals, or the Supreme Court in the *Onofre* matter before this Honorable Federal District Court even though their adverse decisions were predicated on manifest errors of law and fact.

5.  In the *Onofre* case, Mr. Wilson, his associates, and his purported expert witness Brian

    Aust violated several of the Minnesota Rules of Professional Conduct (MRPC)

    including, but not limited to, the following:

> Rule 1.6(a) Confidentiality of Information (Except when permitted
> under paragraph (b), a lawyer shall not knowingly reveal information
> relating to the representation of a client); Rule 1.6(c) Confidentiality of
> Information (A lawyer shall make reasonable efforts to prevent the
> inadvertent or unauthorized disclosure of, or unauthorized access to,
> information relating to the representation of a client); Rule 1.9(c)(2)
> Duties to Former Clients; Rule   3.1   Meritorious Claims and
> Contentions; Rule 3.3(a)(1): Candor toward the Tribunal; Rule 3.4(b)
> Fairness to Opposing Party and Counsel (falsify evidence, counsel or
> assist a witness to testify falsely, or offer an inducement to a witness
> that is prohibited by law); Rule 3.4(c) Fairness to Opposing Party and
> Counsel (Knowingly disobey an obligation  under the rules of a
> tribunal); Rule 4.1 Truthfulness in Statements to Others; Rule 4.4
> Respect for Rights of Third Persons; Rule 5.1(a) Responsibilities of a
> Partner or Supervisory Lawyer; Rule 7.3 Solicitation; Rule 8.1(b) Bar
> Admission & Disciplinary Matters (fail to disclose a fact necessary to
> correct a misapprehension known by the person to have arisen in the
> matter, or knowingly fail to respond to a lawful demand for information
> from an admissions or disciplinary authority); Rule 8.4(a) Misconduct
> (violate or attempt to violate the Rules of Professional Conduct,
> knowingly assist or induce another to do so, or do so through the acts
> of another); Rule 8.4(c) Misconduct (involving dishonesty, fraud,
> deceit or misrepresentation); Rule 8.4 (d) Misconduct (prejudicial to
> the administration of justice).

## II.    JURISDICTION

6.  This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28

    U.S.C. § 1343 (civil rights jurisdiction), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. §

    2201 (declaratory judgement), and 42 U.S.C. §§ 1981, 1983, 1985, 1986, 1988 (to

    redress the deprivation by Defendants (OLPR & LPRB) at all times herein acting under

    color of state law, of rights secured to Plaintiff under the United States Constitution,

    including the First, Fourth, Fifth, and Fourteenth Amendments). Supplemental

jurisdiction over state claims, if any, is appropriate as the events in question "derive from a common nucleus of operative fact." 28 U.S.C. § 1367; *United Mine Workers of Am. V. Gibbs*, 383 U.S. 715, 725 (1966).

### III.    VENUE

7.  Venue properly lies in the District of Minnesota under 28 U.S.C. § 1391 (e)(1) because all the events giving rise to the claims occurred in this district, all Defendants reside in this district, and no real property is involved in this action.

### IV.    PLAINTIFF'S PROFESSIONAL BACKGROUND

8.  Plaintiff obtained his undergraduate degrees in International Relations and Economics from the University of Minnesota in 1983 and 1984 respectively, and his Juris Doctor degree from Hamline University School of Law (recently renamed Mitchell Hamline Law School) in 1987. Plaintiff is admitted to practice law in the States of Minnesota and New York, and before multiple U.S. Federal District Courts; the Second, Third, Fourth, Fifth, Seventh, Eighth, and Ninth Circuit Courts of Appeals; the U.S. Court of International Trade; and the U.S. Supreme Court. *(See* Exhibits 1A & 1B).

9.  From 1988 to 2000, Plaintiff practiced law at the law firm of Hassan & Reed, Ltd, which no longer exists. In 2000, Plaintiff and Jerry Blackwell, along with two other partners, established Blackwell, Igbanugo, Engen, & Saffold P.A. The law firm subsequently changed its name to Blackwell Igbanugo P.A. ("Blackwell Igbanugo").

10. By 2003, the firm had grown to 80-plus attorneys and support staff and expanded to Washington D. C. and Troy, Michigan. In 2003 Blackwell Igbanugo was labelled the largest black controlled law firm in the United States. (*See* Exhibits 1A & 1B). On November 1, 2006, Mr. Blackwell and the Plaintiff officially ended their partnership,

Blackwell Igbanugo dissolved, and Plaintiff established his own law firm, Igbanugo Partners Int'l Law Firm, PLLC in Downtown Minneapolis, where the firm is still headquartered.

11. Plaintiff heads Igbanugo Partners' international trade and development consulting division, Afrique Sub-Sahara Strategies Ltd. (AQS Consulting, *see* https://www.afriquestrategies.com/), focusing primarily on Sub-Saharan Africa. In addition to his acclaimed expertise in U.S. immigration laws, he is also an internationally recognized expert in the U.S. Foreign Corrupt Practices Act (FCPA) with respect to Sub-Saharan Africa. *(See* Exhibits 2-3).

12. Plaintiff's development consulting firm AQS Consulting assists U.S. federal government agencies such as the U.S. Agency of International Development (USAID), U.S. Department of Defense (DOD), U.S. Africa Command (AFRICOM), U.S. State Department (DOS), U.S. Department of Commerce (DOC), U.S. Department of Justice (DOJ), Millennium Challenge Corporation (MCC), etc. in their development efforts in Africa with respect to anti-corruption, rule of law, justice sector reform, countering human trafficking, preventing and/or countering violent extremism (P/CVE), etc. (*See* Exhibits 1-3).

13. Plaintiff has practiced immigration law for 32 years and has represented over 20,000 clients from numerous countries and diverse cultures from all corners of the globe, with mostly favorable results. *(See* Exhibit 18).

14. Plaintiff does not take his accomplished professional record lightly, and is proud of the hard work he has done for the benefit of his clients over the past 32+ years to earn his good reputation. (*See* Exhibits 18 & 28).

15. His firm's website contains information on his numerous publications in international trade and immigration law, Federal Court successes for clients (he has litigated well over 100 immigration cases in the U.S. federal courts, with several presently ongoing), as well as high profile cases that attracted the attention of local and national media (*See* http://igbanugolaw.com/News-Articles/In-The-News/).

16. Plaintiff has also often been consulted by state and national media for commentary on immigration law issues of the day. And over the past 32+ years that he has practiced law in the USCIS St. Paul, Minnesota District, five District directors of USCIS have at one time or another made it a point to personally tell him that all of USCIS staff considers him one of the best and most effective immigration attorney practicing before the District (*See* Exhibit 1A). And Mr. Wilson is aware of these compliments from when he worked for Plaintiff.

17. Plaintiff's legal expertise in the immigration law arena is also well reflected in the number of Equal Access to Justice Act (EAJA) fees he has been awarded in Federal Court litigation in immigration law matters against USCIS/USICE. (*See* Exhibits 1A, 1B, 7, 8, 17, 18, 28, 44, 45, 54, 55, & 57).

18. Under EAJA, "[a]n agency that conducts an adversary adjudication shall award, to a prevailing party other than the United States, fees and other expenses incurred by that party in connection with that proceeding, unless the … position of the agency was substantially justified or that special circumstances make an award unjust." 5 U.S.C. § 504(a)(1); see *Richlin Sec. Serv. Co. v. Chertoff,* 553 U.S. 571, 574 (2008).

19. Plaintiff's Federal Court record over the past decade will show that USICE/USCIS has paid his firm a substantial amount in EAJA fees (***at enhanced legal fee rates in***

7

***recognition by the Federal Courts of his immigration law expertise)*** in many immigration cases where USCIS/USICE's position was not "substantially justified".

20. For instance, see "*Haidari v. Frazier* - United States District Court for the District of Minnesota; Civil No, 06-3215 (DWF/AJB) (2007)," in which the Minnesota District Court awarded the undersigned $22,217.00 in EAJA fees against USCIS in a mandamus action. Also *see Muhur v. Ashcroft*, 355 F. 3d 958 (7th Cir. 2004) 7th Circuit awarded undersigned counsel $15,000+; *Ivanov v. Gonzales*, No. 06-1178 (8th Cir. 2007) 8th Circuit awarded undersigned counsel $32,000+; *Sabhari v. Frazier*, 387 Fed. Appx. 672, 2010 U.S. App. LEXIS 15463 (8th Cir. Minn., 2010) 8th Circuit awarded undersigned counsel $54,000+, etc.

21. David Lee Wilson is well aware of Plaintiff's professional accomplishments because Mr. Wilson was employed by Plaintiff's predecessor firm Blackwell Igbanugo for several years. (*See* Exhibits 1A, 1B & 28). As a matter of fact, Mr. Wilson had been known, in jest, to call himself "Little Herbert" in immigration court when he was employed at Blackwell Igbanugo to identify with Plaintiff in an attempt to gain credibility and/or respect of the immigration judges. (*See* Exhibit 1A).

22. Plaintiff is also an attorney in good standing, admitted to practice law in the following State and Federal Courts (*See* Exhibits 1A & 1B):

- Minnesota, 1988
- New York, 1989
- U.S. Supreme Court, 1992
- U.S. Court of International Trade, 1989
- U.S. District Court District of Minnesota, 1988
- U.S. District Court Northern District of Texas, 1989
- U.S. District Court Northern District of Illinois, 2011
- U.S. District Court Eastern District of California, 2018
- U.S. Court of Appeals 2nd Circuit, 2003
- U.S. Court of Appeals 3rd Circuit, 2002

8

- U.S. Court of Appeals 4th Circuit, 2005
- U.S. Court of Appeals 5th Circuit, 1994
- U.S. Court of Appeals 7th Circuit, 2003
- U.S. Court of Appeals 8th Circuit, 1993
- U.S. Court of Appeals 9th Circuit, 2003

23. At the time the *Onofre* case was brought – and Plaintiff labelled incompetent by Mr.

   Wilson et al. – Plaintiff had litigated eighty to ninety federal lawsuits.

24. Over the past 30+ years of immigration law practice, Plaintiff has represented a myriad

   of large multi-national corporate clients including (*See* Exhibits 1A & 1B):

   ***Xcel Energy – 1994 – 2014***, Plaintiff serviced Xcel Energy as a corporate client from
   1994 – 2014 and filed a total of 287 petitions/applications with U.S. Department of
   Homeland Security (USDHS), out of which he never had a single final administrative
   denial of any petition or application. The breakdown of petitions/application is as
   follows: 98 non-immigrant visas (H's, L's and TN's) filed for employees and family
   members. 29 Labor Certifications with DOL. 76 Form I-140's, I-485's & Form DS-
   230's. 84 miscellaneous applications including EAD's, AP's, etc.

   ***Best Buy – 1995 – 2004***, From 1997-2004 he filed a total of 782 petitions/applications
   with USDHS on behalf of Best Buy, out of which he never had a single final
   administrative denial of any petition or application. The breakdown is as follows: 249
   non-immigrant visas (H's, L's and TN's) filed for employees and family members. 78
   Labor Certifications with DOL. 75 Form I-140's, 139 I-485's & Form DS-230's. 241
   miscellaneous applications including EAD's, AP's, Expats, Canadian work
   authorization, PIO cards, employment/travel letters etc.

   ***Merck – 2004 – 2015***, Plaintiff serviced Merck as a corporate client since 2004 and
   have filed a total of 227 petitions/applications with USDHS, out of which he never
   had a single final administrative denial of any petition or application. The breakdown
   is as follows: 43 EB-1 Based Form I-140's, 67 Form I-485's & Form DS-230's files
   for employees and family members, 108 miscellaneous applications, which included:
   Expats, EADs, Aps, etc, and 9 O-1 & O-3 visas.

   ***Prudential Insurance – 2007 – 2015***, Plaintiff serviced Prudential as a corporate client
   from 2007 – 2015 and filed a total of 146 petitions/applications with USDHS, out of
   which he never had a single final administrative denial of any petition or application.
   The breakdown is as follows: 77 Non-immigration visas (H-'s, L's and TN's), 19
   Labor Certifications with DOL. 16 Form I-140's, I-485's & Form DS-230's. 34
   miscellaneous applications including EAD's, AP's, etc.

   ***Imation – 2008 – 2015***, Plaintiff serviced Imation as a corporate client since 2008 and
   have filed a total of 37 petition/applications with USDHS, out of which he never had

a single final administrative denial. The breakdown is as follows: 17 Expat Visas including (China, Hong Kong, Singapore, United Kingdom and India) and 20 non-immigrant visas (Hs and TNs).

*General Mills – 2001 – 2005*, Statistical number and types of filings unavailable.
*Medtronic – 1993 – 1996*, Statistical number and types of filings unavailable.
*Cargill – 1991 – 1992*, Statistical number and types of filings unavailable.

25. Plaintiff's corporate practice has brought in millions upon millions of dollars in revenue over 30+ years, not to speak of individual clients requiring removal defense, as well as affirmative applications and petitions for lawful permanent resident status and U.S. citizenship. (*See* Exhibit 1A).

26. Mr. Wilson's implausible theory of the *Onofre* case is that Plaintiff intentionally plotted to defraud three Hispanic clients to the tune of collectively $25,000.00 in legal fees through several legal representation contracts in which each client paid between $1,500.00 - $2,500.00 in down payments with monthly payments of $250.00 - $400.00.

27. Further, that Plaintiff guaranteed favorable results of obtaining U.S. lawful permanent resident status or "green cards" within a very short or impossible time period of six months to fraudulently induce the clients to sign the fee agreements. (*See* Exhibit 5).

28. Only an obtuse lawyer will do such a senseless thing, and Plaintiff's fee agreements are very emphatic on this point, which is Plaintiff's inability to guarantee results or the length of time it will take to resolve a matter (*See* Exhibits 1A, 1B, 6, 36, 38, & 40).

29. Very early in lawsuit litigation, Mr. Wilson and his associates made Plaintiff's disciplinary history an issue by citing to an unfortunate Disciplinary Action Plaintiff suffered in 2015 (*See* 863 N.W. 2d 751 (Minn. 2015)) to convey a negative impression of his professionalism to the court in the contrived *Onofre* lawsuit.

30. Factually, on October 18, 2013 the Minnesota OLPR Director issued a petition for disciplinary action against Plaintiff in connection with six separate matters some of which dated back six or seven years prior to the charges.

31. Plaintiff appeared pro se during the entire proceedings before the referee and the Minnesota Supreme Court. On February 12, 2014, the Court referred the matter to the Honorable Paul A. Nelson, Retired Judge of the District Court of Minnesota, to make and report his findings of fact, conclusions of law, and recommendations for discipline on or before June 11, 2014.

32. After a 5-day hearing in May of 2013 with 19 witnesses and over 200 exhibits, during which the quality and substance of Plaintiffs' immigration law expertise and the content of his character were fully displayed, Referee Paul A. Nelson dismissed two of the six separate matters in their entirety, found some ethical violations in four of the matters in the nature of respondent superior, but dismissed the most serious of the charges in those four matters. (*See* Exhibit 18).

33. Judge Nelson also made some redeeming observations, findings and conclusions, which were not appealed by OLPR and therefore became final and irrelevant to the Supreme Court's Decision. The Supreme Court affords "great deference to the referee's findings" and the following are some of the favorable findings made by the referee that were morally vindicating:

> *Respondent did not commit any professional misconduct involving dishonesty, fraud, deceit or misrepresentation.*
>
> *Respondent did not make false statements to the court either overtly or by omission in his collections lawsuit.*

> *Respondent is a supremely confident, assured and competent individual who has strong religious beliefs and high expectations for himself and others.*
>
> Respondent did not file a frivolous collections lawsuit against Y.I. and A.I.  because he had good-faith belief that the Ivanovs owed him legal fees based on the contracts for legal services and that he had good-faith argument that the EAJA fees belonged to him and his firm based on the Rider to the Contract for Legal Services. He notified the Eight Circuit Court of Appeals that the EAJA fees belonged to the firm.
>
> Respondent established through his testimony, the testimony of other witnesses, his telephone log, and telephone records that K. A. and his family members did not repeatedly attempt to reach Respondent by telephone, and that Respondent did not respond to their calls. (*See* Exhibit 18).

34. The Honorable Supreme Court Referee, Paul A. Nelson, also found that "Respondent did not charge unreasonable fees in any of the matters." The referee further observed that "*legal representation continued for all clients even if legal fees were in arrears*" and "*the firm has faced challenges and has had to write off, in the recent past, hundreds of thousands of dollars in unpaid fees.*" This demonstrates the compassionate professional and humane character of Plaintiff.

35. Other than in the *Onofre* case, not once in 30+ years of immigration practice and 20,000 clients served has Plaintiff's firm and Plaintiff ever been sued for legal malpractice, defrauding clients, breach of contract, unjust enrichment, etc. Not only did Plaintiff have a clear disclaimer (in bold capital letters) with respect to not ever making any guarantees as to end result and timing, only a lawyer that is "blind in one eye and can't see out the other" would make such an unethical/obtuse guarantee. (See Exhibits 1A, 36, 38, & 40).

36. The jury ignored the documentary and credible testimonial evidence at trial, and instead, adopted the fabricated and perjured testimony purveyed by Ms. Onofre Cedillo,

Ms. Catano Galvan, Ms. Delgado and their counsels. On information and belief, their counsels of record, Mr. Wilson, Mr. Gavigan, and Ms. Rodelius corrupted the clients and counseled them to tell devious lies to the Court and the Jury for the dual purposes of vendetta and unjust enrichment. (*See* Exhibits 49 & 50).

## V.   DAVID WILSON'S DECADE PLUS ANIMOSITY AND WELL-KNOWN VENDETTA AGAINST PLAINTIFF AND HIS FIRM

37. There is little doubt that the sole purpose of the *Onofre* lawsuit by Mr. Wilson is to further harass and embarrass Plaintiff. The evidence presented by Plaintiff, which includes a long history of David Wilson taking "cheap shots" (*See* Exhibits 1A, 14, 15, 23, 24, 25, 26, 27, & 28) at Plaintiff to satisfy lingering animosity that emanated from their former employer – employee relationship which he continues to harbor against Plaintiff, demonstrates that Mr. Wilson's true goal or motivation in bringing that spurious legal action has always been, and continues to be, to harass and embarrass Plaintiff.

### a. David Wilson's Extra Marital Affair, Anti-Social Behavior, and Dishonest Conduct at Blackwell Igbanugo

38. Mr. Wilson is demonstrably a disgruntled former employee of Plaintiff at his former firm Blackwell Igbanugo P.A. Mr. Wilson had engaged in extramarital affair during his time at Blackwell Igbanugo with a law clerk – Cassondre Buteyn who is now his second wife – whom he brought with him to the firm and directly supervised. This sordid affair caused distractions within the immigration law group at the firm.

39. Under pressure from his then-wife and controversy within the firm, Mr. Wilson decided to leave the firm with the law clerk. But before notifying Blackwell Igbanugo of his intended departure, Mr. Wilson surreptitiously brought in computer equipment to

13

illegally download (steal) all of Blackwell Igbanugo's immigration briefs, substantive cover letters and other proprietary documents contained in Plaintiff's Imanage (document management) system in violation of his employment agreement and ethics rules. (*See* Exhibits 1A, 9, & 10).

40. Furthermore, for several months prior to Mr. Wilson's departure, he also started to fraudulently open files for clients he intended to take with him, for the consultation fee amount of $150, postponing the actual down payment, which is usually 40% to 50% of the total flat fee amount charged to clients, until the time he moved to his new firm.

41. Again, this is pure theft and/or profound dishonesty no matter what light you hold to it, and Plaintiff can now prove Mr. Wilson illegally downloaded firm documents with his use of confidential information during the *Onofre* trial to impeach Plaintiff's expert witness Dyan Williams, which he could have only obtained by illegally downloading Blackwell Igbanugo data when the employer/employee relationship ended.

42. Then, under the cover of night, he sent solicitation letters to all of Blackwell Igbanugo's immigration clients, on firm letterhead without permission, asking the clients to choose between him or staying at the Blackwell Igbanugo firm. He falsely told most of the firm's Hispanic clients that they were assigned to come with him because Cassondre Buteyn, his then love interest, could speak Spanish.

43. Plaintiff around this time period sent Mr. Wilson to the yearly American Immigration Lawyers Association (AILA) immigration law conference in New Orleans along with another former associate, Katie Degrio. At that time, his lawfully wedded wife had discovered his affair with Ms. Buteyn and the "chicken had come home to roost on his first marriage," so to speak.

44. Mr. Wilson defended his actions by claiming his ex-wife suffered from an unidentified mental illness. He started wearing earrings to work, [which was deemed unprofessional at Blackwell Igbanugo], as well as a "five o'clock shadow" type beard, and became increasingly disruptive to the firm.

45. Mr. Wilson caused Ms. Buteyn to call in sick for the days of the AILA conference to join him in New Orleans, even though he ran the risk of the firm's management discovering this illicit rendezvous. Upon his return, Mr. Wilson announced his intended departure from Blackwell Igbanugo and was quickly summoned to a meeting with Plaintiff and former partner, Jerry Blackwell.

46. During that meeting, Mr. Wilson was confronted with his theft of firm proprietary information, fraudulent opening of new client files for the consultation fee amount of $150.00 while the real and substantial down payments (usually 40-50% of the total flat fee quoted) were deferred, the New Orleans rendezvous with Ms. Buteyn, and other chicaneries and machinations he perpetrated at the firm.

47. At the inception of the meeting, after Plaintiff and Mr. Blackwell confronted Mr. Wilson with his betrayal of trust, Mr. Wilson started to sob uncontrollably instead of being contrite and accepting responsibility for his misdeeds. Plaintiff found himself handing Mr. Wilson a bunch of napkins and feeling very sorry for him. Mr. Blackwell felt the same way, so both decided to "let him be" and only locked him out of the firm which unquestionably left Mr. Wilson feeling belittled and dejected, which feelings are obviously still with him.

48. It is also important to mention that at the time that Plaintiff negotiated his joining the Blackwell Igbanugo firm, future fees for the few ongoing matters he brought with him

15

to the firm were supposed to go to Blackwell Igbanugo. However, firm management had good reasons to believe that Mr. Wilson diverted some if not most of the checks from those clients to his home and retained them.

49. The only way to have proven this would have been to initiate litigation and subpoena his bank records. But again, after Mr. Wilson cried or sobbed uncontrollably, Mr. Blackwell and Plaintiff determined that he was not worth the hassle nor did they wish to cause him any more shame and distress.

### b. The Candelaria Dominguez-Capistran Matter

50. Mr. Wilson underhandedly orchestrated the filing of a *Lozada* complaint against Plaintiff by his former law partner, Julie Zimmer, soon after his departure from Blackwell Igbanugo, PA in the *Candelaria Dominguez-Capistran* immigration and ethics matter. And this is in spite of the fact that Mr. Wilson had personally worked on the unsuccessful motion to reopen and rescind the problematic in absentia removal order before the Immigration Court in that matter.

51. That was the first time Mr. Wilson engaged in a sinister cabal against Plaintiff, but had someone else do his dirty work. Mr. Wilson had just left Blackwell Igbanugo, solicited Ms. Dominguez-Capistran to his new firm and instigated his then new partner, Ms. Julie Zimmer, to file a *Lozada* complaint against Plaintiff (his old boss). Mr. Wilson continues to unfairly attack Plaintiff at every turn, even now well over a decade later.

### c. The Tim Hart Incident

52. Mr. Wilson had also taken another shot at Plaintiff when he was chair of the Minnesota/Dakotas chapter of the American Immigration Lawyers Association. Mr. Wilson's unprofessional behavior, which complainant now refers to as the "Tim Hart

incident" had to do with holding a naturalization seminar for the benefit of the public at his firm, located on Lake Street. But it ended up being a marketing scheme for Mr. Wilson to bring in new clients for his own financial benefit. Members of the chapter were invited to participate.

53. When an associate of Igbanugo Partners at the time, Mr. Tim Hart, attempted to sign up to attend, Mr. Wilson blocked his effort and responded to Mr. Hart by email that he was not welcomed to his firm for the event, indicating that he "has issues with Herbert". Plaintiff responded to Mr. Wilson that he should get over their old employer/employee relationship, and permit Mr. Hart to participate like every other member of the chapter. Plaintiff copied the entire list serve on the email to Mr. Wilson.

54. This brought forth a rain of unflattering commentary that adversely impacted Mr. Wilson's unremarkable tenure as chair of the Minnesota/Dakotas chapter. Countless open emails to the list serve condemned his lack of professionalism.

55. One need not shine too much light at this record of events to truly see Mr. Wilson's paltry spirit and the very poor content of his character. Plaintiff only goes into this much detail about Mr. Wilson's ill will towards him because it is relevant with respect to his credibility, the unethical tactics he employed or deployed, the sequence of events leading up to, and the real reason for the meritless/unethical lawsuit he filed in the *Onofre* case as well as his post *Onofre* ethics complaint to OLPR.

### d. The Marco Antonio Andrade-Mendoza and Yolanda Andrade Meritless Ethics Complaint

56. On February 5, 2015 at the alleged behest of two former clients of Igbanugo Partners, Marco Antonio Andrade Mendoza and Yolanda Andrade, Mr. Wilson filed a complaint with the Minnesota OLPR alleging amongst other things, that Plaintiff provided

17

ineffective assistance of counsel to the couple, that he was not diligent in handling their case, that he told Mr. Andrade to make a false statement to the immigration court, that he delayed their case, and that Plaintiff's representation lacked competence. (*See* Exhibits 14, 15, & 27).

57. Predicated on this complaint, Mr. Wilson proceeded to file a motion to reopen the *Andrade* case with the Board of Immigration Appeals [BIA] based primarily on ineffective assistance of counsel pursuant to the seminal BIA case of Matter of *Lozada*, 19 I & N Dec. 637 (BIA 1988). (*See* Exhibit 1A).

58. *Lozada* requires that counsel, whose integrity or competence is being impugned, be informed of the allegations and be given an opportunity to respond. *Lozada* and other BIA precedents further require that any subsequent response from counsel, or report of counsel's failure or refusal to respond, should be submitted with the motion.

59. Mr. Wilson failed to forward Plaintiff's two responses with the *Lozada* motion to the BIA. Since the BIA did not receive Plaintiff's response (which Mr. Wilson intentionally withheld) to the *Lozada* complaint, its decision to reopen Mr. Andrade 's proceeding based on ineffective assistance of counsel rested entirely on Mr. Andrade and Mr. Wilson's bare allegations. (*See* Exhibit 1A).

60. This was purposeful concealment to gain an unethical and unfair advantage before the BIA relative to the motion, and to damage Plaintiff's reputation.

61. In terms of misleading the BIA, for Mr. Wilson to send the motion without Plaintiff's responses which Plaintiff timely provided to him created the false impression that Plaintiff was informed of the allegations, and provided no response. This, in and of itself, was fundamentally unfair and egregiously unethical.

18

62. Mr. Wilson had the presence of mind to bring the decision to the attention of the Minnesota OLPR. Yet, he did not have the presence of mind to provide Plaintiff's two substantive responses to the BIA. The complaint Plaintiff filed with the Minnesota OLPR was unjustly dismissed without an investigation. (*See* Exhibit 98).

63. Plaintiff appealed it to the Minnesota LPRB and the assigned panel member concurred with the OLPR for the same reason, which is essentially that the BIA has to find that Mr. Wilson ran afoul of a code of conduct during the *Lozada* proceedings.

64. In dismissing the complaint, the OLPR Director in relevant part said (*See* Exhibit 98):

> Whether Mr. Wilson complied with the immigration tribunal's requirements as to what documents needed to be filed in connection with a motion to reopen, *is a question of law, not professional responsibility, at least in the first instance.  Legal questions are best resolved by courts.*

65. And in concurring with the OLPR Director and similarly dismissing the case, the assigned LPRB member opined (*See* Exhibit 98):

> I have reviewed all of the materials submitted by the Complainant and agree with the Director's office that the *allegations of the Complaint are all issues of law and fact that are better left to the appropriate Court* … if a Court determines that the Respondent engaged in conduct that violates the Minnesota Rules of Professional Conduct, Complainant can file a new Complaint based upon those determinations.

66. It is not insignificant that Marco Andrade and Yolanda Andrade went to two lawyers for a second opinion and those two lawyers "left well enough alone". According to Yolanda Andrade's affidavit, "We consulted with two other attorneys but they seemed hesitant to take my husband's case. Then on December 31, 2013, we met with Mr. David Wilson to discuss our cases. *It was immediately obvious to Mr. Wilson that Mr.*

> *Igbanugo had messed up our case and over charged us.* We hired him within the week to work on the case instead." (*See* Exhibit 14).

67. In this same regard the Supreme Court referee in his Decision and Order found that:

> The Andrades decided to retain new counsel because of their dissatisfaction with the Respondent and his law firm. They contacted four other immigration attorneys before they found an attorney willing to take their case. That attorney was David Wilson, a former associate of the Respondent who left Respondent's firm on less than pleasant terms. (*See* Exhibit 27).

68. The mean-spirited energy put into that false ethics complaint by Mr. Wilson went above and beyond Mr Wilson's so called "duty". Mr. Wilson's appeal from the initial dismissal of the ethics complaint – after Mr. Andrade achieved a reopening of his case – certainly goes much further than what a fellow immigration attorney with no special interest would do.

69. The complaint was contrived and bogus, and interposed entirely for purposes of revenge. Three well respected immigration lawyers in Minnesota who reviewed this matter agree that Mr. Wilson appears to have other motivations and acted unethically (*See* Exhibit 28).

### e. David Wilson's Theft of Firm Funds at Blackwell Igbanugo

70. It was not until the Dyan Williams immigration disclosure during the *Onofre* trial that Plaintiff obtained the evidence to prove that Mr. Wilson unethically downloaded (stole) Blackwell Igbanugo proprietary documents. And it was not until Plaintiff determined to search the "Z drive" of the firm's old computer systems that he was able to locate the correspondence related to Mr. Wilson's theft of Blackwell Igbanugo's firm funds and proprietary documents. (*See* Exhibits 80, 81, & 83).

71. On February 26, 2004 (shortly after Mr. Wilson departed from Blackwell Igbanugo), former Blackwell Igbanugo firm administrator Ms. Terri Spandl wrote to David Wilson and said:

> Enclosed please find a note and copy of a cancelled check that we received from Mr. and Mrs. Mena.  Their note indicates that they sent you a check in the amount of $500 dated June 10, 2003 for payment on their Blackwell Igbanugo invoice.  *The cancelled check shows that you endorsed the check and it was deposited in an account that is not a Blackwell Igbanugo account.  We have checked our records to see if this check was ever accounted for in our deposits in the months preceding the date of the check.  It was not. (emphasis added)*

72. And Jerry Blackwell's letter to David Wilson of March 12, 2004, states that:

> A possible fiscal impropriety was recently brought to my attention.  During your stay at the firm, one of our Immigration clients, Maria Mena, delivered a check to you for legal services rendered.  She owed the firm approximately $2,000, payable in four monthly installments.  *You cashed the first of those checks personally, with no accounting for having received it and no explanation to the firm of why you converted the check to your own personal use.  When we recently contacted Ms. Mena on the status of her balance owing, she indicated that she had already paid the balance due in the form of the check which you had secretly converted earlier.  That check was in the amount of $500.*
>
> When we questioned you about this, your reply was that these were funds Ms. Mena owed you before you joined our firm, and then you invited us to send Ms. Mena another invoice for the same amount, which you indicated she would pay.  *We called her.  She states that you called her within the last couple of days saying that she owed $500 to our firm.  She did not indicate that it is now her intent to send you the earlier monies for your personal conversion or for any reason other than to satisfy this firm's outstanding bill…*In any event, I was not aware that any clients of our firm were bringing checks to you for services rendered to us which you were converting to your own personal use, with no notice to the firm or documentation of any kind. (emphasis added)

73. And in a letter of September 22, 2003 to Ms. Julie Zimmer, Mr. Blackwell also lamented:

> *I write to you not knowing what other incidents of unprofessional and unethical behavior will be discovered concerning Mr. Wilson. Mr. Wilson has continually lied to us.* Mr. Wilson has stated that other than the client list that he took, that no other Blackwell Igbanugo proprietary information was removed from our premises by him or Ms. Buteyn. Frankly, I don't know what to believe… (emphasis added)

74. And finally, in connection with Mr. Wilson's and Ms. Buteyn's false and unethical claim of unemployment compensation, Ms. Terri A. Spandl's letter of September 29, 2004 to the Minnesota Department of Economic Security indicated:

> Both Mr. Wilson and Ms. Buteyn have been officing out of the law firm of Larson Zimmer since September 18, 2003.  They have email accounts set up and we have been transferring client files to that address.  Additionally, I have attached a letter that we received from Ms. Buteyn on Larson Zimmer letterhead.  I have redacted the client name for client confidentiality reasons.
>
> In conclusion, we believe that both Mr. Wilson and Ms. Buteyn voluntarily quit our employ.  *Our generosity in allowing them to stay through their 2-week notice period was repaid by their misappropriating client information which is considered gross misconduct and grounds for immediate termination. (emphasis added)*

75. At the time, Plaintiff did not pay much attention to the administrative interactions between Ms. Spandl, Mr. Blackwell, and David Wilson/the Larson Zimmer firm where he went to work from Blackwell Igbanugo. But it is quite clear that Mr. Wilson converted or stole a check in the amount of $500 that belonged to Blackwell Igbanugo. And when his theft/dishonesty was uncovered, he contacted the client and covered up by orchestrating the issuance by the client of another check to cover his theft.

76. Simply put, Mr. Wilson cashed or deposited checks that belonged to Blackwell Igbanugo in his personal account, and the money was handled with no accounting or notice to the firm whatsoever. Mr. Wilson never documented his activity in this regard,

and never intended anyone at Blackwell Igbanugo to uncover it. If this isn't profoundly

unethical, then the ethics rules do not apply to Mr. Wilson.

77. Mr. Blackwell and Ms. Spandl are still very much around the Twin Cities, and I am

sure OLPR can track down Magdaleno Salas Mena, the client involved. But

OLPR/LPRB again opted to accord Mr. Wilson racial privilege and look the other way.

## VI.    THE *TRUE* FACTUAL BACKGROUND OF THE IMMIGRATION CASES OF – AND FEE AGREEMENTS EXECUTED WITH – THE THREE INDIVIDUAL HISPANIC CLIENTS[2]

78. What transpired in the *Onofre* case before the Minnesota State Courts was an egregious

miscarriage of justice. Again, not only did Plaintiff have a clear disclaimer (in bold

capital letters) with respect to not ever making any guarantees as to end result and

timing, again, only a really dumb lawyer begging for trouble would make such an

unethical guarantee because it is a prescription for disaster every time. (*See* Exhibits

1A, 36, 38, & 40).

79. Upon information and belief, in counseling the Plaintiffs to lie under oath during trial

contrary to what they stated in their depositions, Mr. Wilson suborned perjury. Mr.

Wilson intended for his malicious and vicious lies contained in the pleadings to be

continuously repeated and widely disseminated by word of mouth and internet media.

(*See* Exhibit 8 & 94).

80. And this was done with knowledge of their falsity or a reckless disregard for the truth,

and out of ill-will and spite. Mr. Wilson had "unclean hands" in commencing the

---

[2] Plaintiff recites in some detail what transpired in the *Onofre* case simply to expose multiple violations of the ethics rules by Mr. Wilson et. al. during the civil litigation proceedings. Again, Plaintiff does not contest the result of the case in Minnesota State Courts.

*Onofre* lawsuit in bad faith, and engaging in defamatory conduct and disparagement, irretrievably damaging Plaintiff's professional reputation.

81. The exculpatory deposition testimony of the three Plaintiffs (*See* Exhibits 41, 42, & 43) (as opposed to their contradictory and false testimony at trial) constitutes "smoking gun evidence" of Mr. Wilson's knowing and intentional fabrication of Plaintiffs' allegations and perjured trial testimony.

82. The Wilson Firm engaged in extreme and outrageous conduct in engaging in a campaign of lies, disparagement, defamation, harassment, and maliciousness directed at Plaintiff and his firm that is beyond the bounds of decency and ought not be tolerated in a civilized society.

83. Each of the fee agreements executed with the Hispanic clients by Plaintiff (*See* Exhibits 36, 38, & 40) in relevant part states – in bold, capital print - as follows:

> **YOU UNDERSTAND THAT <u>NO GUARANTEE</u> CAN BE PROVIDED REGARDING HOW LONG THE CASE WILL TAKE NOR WHETHER THE OUTCOME WILL BE SUCCESSFUL. IGBANUGO PARTNERS PROMISES TO EXERT IT'S BEST EFFORTS TO ACCOMPLISH THE IMMIGRATION OBJECTIVE AS QUICKLY AS POSSIBLE**.

84. The true facts of the *Onofre* case remain the same and must inform this Honorable Court's decision in connection with the instant meritorious plea for declaratory judgement that Mr. Wilson et. al. have engaged in vexatious litigation and meritless ethics complaints. Plaintiff will now briefly outline the background of each of the three immigration matters from whence the *Onofre* lawsuit and cross-complaints or reports to the Minnesota OLPR emanated. (*See* Exhibit 1A & 58).

### a. Olimpia Onofre Cedillo

85. Olimpia Onofre Cedillo initially hired Plaintiff and executed a fee agreement on 8/27/2013 for a stand-alone Form I-130 relative immigrant visa petition, which Plaintiff successfully accomplished for her.

86. She then executed a second fee agreement on 6/03/2014 for Form I-60A waiver, in anticipation of changes in the U.S. immigration laws with respect to expansion of qualifying relatives and beneficiaries. (*See* Exhibits 19-22). She retained Plaintiff's services after they had successfully resolved a complex immigration matter for her daughter and son in law.

87. Plaintiff advised Olimpia Onofre Cedillo that her daughter would be able to petition for her on Form I-130, Petition for Alien Relative. He further advised Ms. Onofre Cedillo that he anticipated changes in the immigration laws that may expand the I-601A waiver to possibly include U.S. citizens and lawful permanent resident children as qualifying relatives.

88. In light of this anticipated expansion, Ms. Onofre Cedillo and Igbanugo Partners entered into an agreement and/or contracted for the filing of the family-based petition (Form I-130) initially, and later for the preparation of an I-601A pending immigration law changes by legislation or executive orders. (*See* Exhibits 19-22).

89. This naturally metamorphized into an all-inclusive or full-scale representation in all immigration matters including removal defense if it became necessary. It also included exploring U-visa possibilities for Ms. Onofre Cedillo's husband or any other possible avenues of relief that Plaintiff may determine in the future. Plaintiff explained to Olimpia that he would only amend the fee agreement to specify a u-visa petition if he was able to obtain the requisite certification from law enforcement.

25

90. Retaining an immigration attorney in anticipation of legislative or regulatory changes are customary practices in the immigration field. Indeed, Co-Defendant David Wilson is aware of this practice and has himself contracted with clients in anticipation of regulatory or legislative changes as evidenced by Plaintiff's submissions to the *Onofre* Court even though the evidence was ruled inadmissible. (*See* Exhibits 19-22 & 31).

91. Plaintiff clearly stated to Ms. Onofre Cedillo that the basis of the contract was in anticipation of future regulatory changes and/or changes in personal or family circumstances. Upon delay in these changes, he suggested to Ms. Onofre Cedillo another potential option, specifically Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA).

92. It is not unusual at all for the pursuit of immigration relief to become a *moving goal post* after commencement of representation, which requires that all options be kept open for possibly pivoting to any relief that may become available by passage of time, change in individual circumstances, changes in the immigration laws, political changes in the alien's country of origin that may impact eligibility for asylum, etc.

93. It was only after Ms. Onofre Cedillo encountered Mr. Wilson (who solicited her into this lawsuit by appealing to her self-interest and greed), that she claimed she was unaware of these terms and conditions of Plaintiff's legal representation and that the contract was unfair.

### b. Maria Delgado

94. Maria Delgado initially retained Plaintiff's services on 09/18/2013. At the time she retained his services she informed him that she entered the U.S. as a "wave through" and that she had a U.S. citizen boyfriend whom she intended to marry in the future.

95. This initial agreement was superseded by a new agreement executed on 10/14/2013 after her personal circumstances changed. Plaintiff had successfully obtained a green card via spousal visa petition and adjustment of status for her son-in-law Horacio, based on a "wave through" entry.

96. A "wave through" is considered an admission under immigration law but proving a "wave through" typically requires at least an affidavit of another person present at the time and any other credible corroborating evidence. This would have allowed Ms. Delgado to gain legal permanent residency inside the U.S. without the need of a provisional unlawful presence waiver.

97. Ms. Delgado informed Petitioner that she believed she could obtain corroborating evidence as she was accompanied and/or driven across the U.S./Mexico border by another individual; however, she was later unable to find this other individual to help prove her claim.

98. Additionally, Ms. Delgado informed Petitioner that she had intentions to marry her then boyfriend, a U.S. citizen, at some point in the near future. A U.S. citizen husband would be a qualifying relative for a Form I-601A waiver. For reasons unknown to Plaintiff, Ms. Delgado and her boyfriend did not eventually wed either. Plaintiff then informed Ms. Delgado that while her daughter was not currently a qualifying relative for the purposes of an I-601A waiver, they anticipated an expansion of qualifying relatives in impending regulations.

99. He also advised Ms. Delgado of anticipated changes in immigration process, namely DAPA through Obama's Immigration Accountability Executive Action. Again, because a feature of immigration law is frequent regulatory and/or legislative changes,

retaining counsel in anticipation of these changes is common practice. (*See* Exhibits 19-22 & 31).

100.     Again, counsel David Wilson is well-aware of and engages in this practice himself. (*See* Exhibit 31). Despite this, Mr. Wilson, who has a virulent hatred for Plaintiff, used these clients as proxies in his unholy vendetta against Plaintiff.

101.     Plaintiff clearly stated to Ms. Delgado that a basis of the contracts was in anticipation of future regulatory changes in U.S. immigration laws or favorable changes in her personal circumstances. Upon delay in these changes or their failure to come about, Plaintiff promptly informed Ms. Delgado that Obama's executive action presented another option, specifically DAPA.

102.     It was only after Ms. Delgado encountered Mr. Wilson (who solicited her into this lawsuit by appealing to her self-interest and greed), that she claimed she was unaware, did not recall the above conditions, and that the contract was unfair.

### c. Alexandra Catano-Galvan

103.     Alejandra Catano Galvan first retained Plaintiff's services on 08/15/2011 for a one step application for Form I-130, Form I-485, and I-765. Her family members and children were also the beneficiaries of a successful immigration matter that was handled by Plaintiff's firm.

104.     At the time she had advised Plaintiff that she was a "wave through" and knew the whereabouts of the person who brought her into the United States by car through a legal port of entry. But she then disappeared for long periods of time without returning calls, emails, or letters. She subsequently reappeared after a lengthy period of time and signed

a second agreement that superseded the first one when she could not find or provide evidence to support her "wave through" entry.

105.    The second retainer agreement was executed with advice to Ms. Catano Galvan of anticipated regulatory changes to the I-601A Waiver, specifically its possible expansion to include lawful permanent resident spouses, as well as U.S. citizen and lawful permanent resident children.

106.    Again, retaining an immigration attorney in anticipation of legislative or regulatory changes are customary practices in the immigration field. (*See* Exhibits 19-22 & 31). Again, Mr. Wilson and his wife Ms. Buteyn are well aware of this practice and have contracted with clients in anticipation of regulatory or legislative changes. Despite this, Mr. Wilson filed the legal action as another attempt to further beleaguer Plaintiff.

107.    Plaintiff informed Ms. Catano Galvan that most lawyers and stakeholders in the immigration field anticipated regulatory changes to Form I-601A, specifically an expansion of the qualifying relatives to include U.S. citizen children amongst others. Ms. Catano Galvan entered into the contract with this advisory.

108.    Ms. Catano Galvan, aware that there was no guarantee of success in her case, contracted for the filing of a Form I-130 and preparation of Form I-601A if and when the laws change. However, after she encountered Mr. Wilson, like the other two she made the same dishonest claim as they did. All three knew each other well, which is how they all became Plaintiff's clients.

109.    Mr. Wilson obviously solicited these Plaintiff's clients with whom he was still in good standing, because Plaintiff had previously done very good legal work for the children of all three clients, obtaining the immigration relief they requested.

110.    They still called Plaintiff a good lawyer until the very end, which is indicative of Mr. Wilson's unethical solicitation. Had OLPR endeavored to conduct any investigation – pursuant to Plaintiff's ethics complaint - in this regard, the evidence of solicitation may well not be circumstantial at this point.

## VII.    DOCUMENTED CONSTANT CHANGES IN THE U.S. IMMIGRATION LAWS

111.    The U.S. immigration laws and regulations have always been a "moving goal post". A number of key legislation and presidential executive orders in the past several decades have dramatically shifted the U.S. immigration laws.

112.    The most recent drastic immigration reform was the *Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)* of 1996, Pub.L. 104-208, 110 Stat. 3009-546, in effect. Coming on the heels of similar legislation passed with notable regularity in 1986, 1988, 1990, 1991, 1994, and earlier in 1996, IIRIRA was heralded as a 'landmark' law, the toughest 'in a generation.'" (*See* Removing Criminal Aliens: The Pitfalls and Promises of Federalism, 22 Harv. J.L. & Pub. Pol'y 367, 371 (1999)).

113.    According to the *Pew Research Center* in its November 21, 2014 article entitled, "Executive Actions on Immigration have Long History" by Drew Desilver, "The 39 executive grants of temporary immigration relief" since 1956 covered, among other groups, Ethiopians fleeing that country's Marxist military dictatorship in the 1970s, Liberians who escaped their country's brutal civil wars, and foreign students whose academic eligibility was interrupted by Hurricane Katrina. Other actions taken by prior administrations affected considerably more people. Most of them were eventually formalized or superseded by legislation, though sometimes — as often happens with complicated subjects such as immigration — the new laws led to new issues."

114.    According to a detailed report from the *American Immigration Council*, presidents have routinely altered immigration policies by executive order, including 18 such changes by five recent Republican presidents — Eisenhower, Ford, Reagan, Bush I and Bush II. They include:

> Pres. Dwight Eisenhower: 1956 – By executive order, circumvented immigration quotas to allow 900 orphans to join their adoptive families in the U.S.; 1956-1958 – By executive order, allowed 31,000 Hungarian anti-Soviet insurgents to emigrate; 1959-72 – By executive order, allowed 600,000 Cubans fleeing Castro to emigrate. Pres. Gerald Ford: 1975 – By executive order, allowed 360,000 refugees, mostly from Vietnam, to emigrate; 1976 – By executive order, allowed 14,000 Lebanese nationals to emigrate. Pres. Ronald Reagan: 1981 – By executive order, allowed 7,000 Polish anti-Communists to emigrate; 1982 – Allowed 15,000-plus Ethiopians to emigrate; 1987 – By executive order, rescinded deportation of 200,000 Nicaraguans; 1987 – By executive order, deferred deportation of undocumented children of 100,000 families.

> George H.W. Bush: 1989 – By executive order, deferred deportations of Chinese students; 1989 – By executive order, reversed visa denials of 7,000 Soviets, Indochinese; 1990 – By executive order, deferred deportations of previously amnestied citizens' 1.5 million spouses and children; 1991 – By executive order, deferred deportation of 2,000 Gulf War evacuees; 1992 – By executive order, deferred deportations of 190,000 El Salvadorans. George W. Bush: 2002 – By executive order, expedited naturalization for green-card holders who joined military; 2005 – By executive order, deferred deportation of students affected by Hurricane Katrina; 2006 – By executive order, enabled 1,500 Cuban physicians to seek asylum at US embassies; 2007 – By executive order, deferred deportation of 3,600 Liberians. (November 17, 2014)

115.    The outgoing Trump administration racked up 400+ executive orders changing immigration law and policy according to the Migration Policy Institute' (MPI) publication entitled, "Dismantling and Reconstructing the U.S. Immigration System: A Catalog of Changes Under the Trump Presidency."

116.    Some immigration lawyers have even gone as far as to advocate that an attorney must provide his client with predictions about future changes in immigration law based

31

on an alleged "trend", and that failure to anticipate a change in the law constitutes

ineffective assistance of counsel. But this was flatly rejected by the Court (*United States*

*v. Agoro*, 2011 U.S. Dist. LEXIS 140476, 2011 WL 6029888 (D.R.I. Nov. 16, 2011).

117.    The Court in *Agoro* indicated that it had little difficulty finding that counsel was

not ineffective in failing to advise his client, "that immigration law was undergoing …

major changes, and that a trend was developing toward categorical deportation…."

However, the frequency with which immigration law changes should always be

factored into the relief eligibility equation for immigration counsel to adequately

protect the interests of their clients.

## VIII.    "WAVE THROUGH" CASES IN U.S. IMMIGRATION LAW

118.    Maria Delgado and Alejandra Catano Galvan were clearly eligible for immediate

immigration benefits based on immigrant visa petitions filed by their daughters, had

their circumstances remained the same as they outlined at the inception of Plaintiff's

legal representation, because both were "wave throughs."

119.    A foreign national who entered as a "wave through" was "inspected and admitted"

for purposes of INA § 245(a) and may adjust his status to that of lawful permanent

resident even though he does not currently have any valid status.

120.    A foreign national who physically presents himself to immigration authorities and

makes no knowing false claim to citizenship is "inspected" for purposes of INA §

245(a). Furthermore, an "admission" occurs when the inspector permits the foreign

national to pass through the port of entry even though he volunteers no information and

is asked no questions by the immigration authorities.

121.    In *Matter of Areguillin*, 17 I&N Dec. 308 (BIA 1980), the respondent testified that

she crossed the Mexican–United States border in a car with two couples and another

woman. Id. At 309. She had no travel or entry documents in her possession at the time.

The respondent stated that the immigration officer looked inside the car, asked the

driver a question, and then permitted the car and its occupants to proceed into the United

States. Id. The Board held that if these "facts are found to be as claimed by the

respondent, she was inspected and admitted within the contemplation of the law."  Id.

122.    The BIA specifically reaffirmed *Areguillin* post-IIRIRA in *Matter of Quilantan*, 25

I. & N. Dec. 285, 290-91 (2010). The Board specifically "[found] that, by themselves,

the terms "admitted" and "admission," as defined in section 101(a)(13)(A) of the Act,

continue to de-note procedural regularity for purposes of adjustment of status, rather

than compliance with substantive legal requirements."  Id at 290.

123.    The Board further elaborated that they "find no indication that in enacting the

current definition of the term 'admitted' at section 101(a)(13)(A) of the Act, Congress

intended to supersede the Board's long-standing interpretation of that term as it applies

to the 'inspected and admitted' requirement of section 245(a).

124.    A reasonable attorney exercising proper care could take these cases (The three *Onofre*

case clients) as Plaintiff did, especially when there were anticipated changes in

circumstances/facts or law. It was not impossible for either of these changes to have

occurred, as Mr. Wilson falsely contended at trial. An attorney does not run afoul of the

standard of care for hoping for or expecting material changes in law or circumstances to

occur.

33

125.    The point is no I-601A was filed for the three Hispanic clients when they had no qualifying relatives and none of them were counseled to leave the U.S. to file for the immigrant visa. (*See* Exhibits 7, 8, & 35).

126.    A reasonable attorney exercising proper care could file an I-130 petition as Plaintiff did. The requisite relationship between the petitioner and beneficiary existed. The I-130 approval is the first step to seeking I-485 adjustment or immigrant visa processing at a consulate. No harm, such as increased risk of being placed in removal proceedings, was created. (*See* Exhibits 7, 8, & 35).

127.    Plaintiff did not prejudice their cases or prevented them from seeking alternative relief. It is actually irresponsible for an attorney to counsel clients that there is such a heightened risk and cause them unnecessary fear as Mr. Wilson and Mr. Aust did in this instance. (*See* Exhibits 7, 8, & 35).

128.    Brian Aust is far from an expert in U.S. immigration and nationality laws, based on the incorrect substantive content of his so-called expert report. His credentials show that he had never before been retained as an expert in any aspect of immigration law and is a relatively unaccomplished immigration practitioner (compared to Plaintiff's experts Dyan Williams and R. Leo Pritschet). It was not a surprise that Mr. Wilson's good friend Mr. Aust was the best immigration practitioner he could find to testify falsely as a "purported expert" in the *Onofre* matter. (*See* Exhibits 7, 8, & 51).

129.    David Wilson himself entered his appearance as primary counsel at the initiation of the legal action, but after Plaintiff filed an answer and motion to dismiss with request for Rule 11 sanctions, his name disappeared from the documents and case without leave

of Court, in violation of Rule 105 of the Minnesota General Rules of Practice (*Rule 105 Minn R. Gen. Prac.*).

130.    He also ***affirmatively dodged*** service of a subpoena (*See* Exhibit 46) to be deposed during discovery when his associate Mr. Gavigan had led Plaintiff to believe that he would be available. This is certainly unethical as it is prejudicial to the orderly and fair administration of justice.

### IX.    *ONOFRE* LAWSUIT BACKGROUND AND MR. WILSON'S DISHONEST AND UNETHICAL COMPLAINT IN *ONOFRE CEDILLO ET AL V. IGBANUGO PARTNERS ET. AL.*

131.    On April 11, 2016, Plaintiff's former clients Alejandra Catano Galvan, Maria Delgado, and Olimpia Onofre Cedillo, through counsels Mr. Wilson, Mr. Gavigan, and Ms. Rodelius (with Ms. Cassondre Buteyn, wife of David Wilson, complicit) by complaint initiated a frivolous law suit in the Minnesota District Court (Hennepin County) against Plaintiff and his law firm Igbanugo Partners Int'l Law Firm, PLLC, alleging: 1)Violations under the Uniform Declaratory Judgements Act; 2) Malpractice/Negligence in the Provision of Legal Services; 3) Breach of Contract; 4) Promissory Estoppel; 5) Unjust Enrichment; 6) Conversion; 7) Violation of Minnesota Prevention of Consumer Fraud Act – Unlawful Practices; and 8) Intentional/Negligent Misrepresentation. *(See* Exhibit 5).

132.    Mr. Wilson et. al. committed numerous and varied acts of ethical misconduct including multiple written and oral misrepresentations, and representing a client with a conflict of interest which resulted in substantial harm to three former clients (Plaintiff, Igbanugo Partners Int'l Law Firm, (successor in interest of Blackwell Igbanugo), and Ms. Dyan Williams, Esq.).

133.    Hiding behind judicial privilege, Mr. Wilson unleashed a plethora of meanspirited

defamatory statements, averring falsely, for one example among many, that Plaintiff, a

long-standing and well-respected member of the immigration law community, failed

*"to have a reasonable understanding of immigration law and procedure."* Further, and

worse yet, that Plaintiff engaged in *"conduct evidencing professional negligence and*

*fraud."* (*See* Exhibit 5).

134.    Other intentionally disparaging, mean-spirited, and unethical falsehoods contained

in the Complaint include but are not limited to the following:

Paragraph 17: Defendants' representations to Plaintiffs, about their
eligibility for the contemplated relief, *were false and made to induce*
*Plaintiffs into hiring Defendants for their services.*

Paragraph 25: Defendant Igbanugo further assured Plaintiff that the
*process would be complete and favorably resolved in less than one*
*year.*

Paragraph 59: Defendant Igbanugo negligently represented Plaintiff
Onofre Cedillo by either: *failing to have a reasonable understanding*
*of immigration law and procedure;* or by intentionally misrepresenting
such.

Paragraph 65: *Plaintiff relied on the multiple misrepresentations and*
*outright fabrications of Defendants* when Plaintiff Onofre Cedillo
agreed to pay Defendants for all services.

Paragraph 66: *Defendants either negligently, or knowingly and in bad*
*faith,* advised Plaintiff Onofre Cedillo to prepare and file unnecessary
or improper applications, petitions, and/or supporting documents.

Paragraph 75: As a result of *Defendant Igbanugo's incompetence,*
Plaintiff Onofre Cedillo has expended significant funds for both legal
representation ...

Paragraph 76: Plaintiff paid at least $8,595.00 to Defendants for *faulty*
*and fraudulently induced immigration legal services.*

Paragraph 86: Defendant Igbanugo further assured Plaintiff that *the*
*process would be complete and favorably resolved in approximately six*

*months.*

Paragraph 103: In response, Defendants indicated that Plaintiff *would now have to find someone to marry* in order to derive any benefit from the approved 1-130.

Paragraph 118: *Defendant Igbanugo negligently represented Plaintiff by either: failing to have a reasonable understanding of immigration law and procedure; or by intentionally misrepresenting such.*

Paragraph 119: Defendants *filed* and maintained immigration applications and/or petitions seeking relief which was not warranted by existing law or by a nonfrivolous argument for the extension …

Paragraph 122: Instead, Defendants assured Plaintiff Delgado that the process would be simple, *was guaranteed to be approved* …

Paragraph 124: *Plaintiff relied on the multiple misrepresentations and outright fabrications of Defendants* when Plaintiff agreed to pay Defendants for all services.

Paragraph 125: Defendants either *negligently, or knowingly and in bad faith*, advised Plaintiff to prepare and file unnecessary or improper applications, petitions, and/or supporting documents.

Paragraph 134: As a result of Defendant *Igbanugo's incompetence*, Plaintiffs expended significant sum's for both legal representation …

Paragraph 135: Plaintiff paid at least $6,300.00 to Defendants for faulty and *fraudulently induced immigration legal services.*

Paragraph 174: Defendant Igbanugo negligently represented Plaintiff Catano Galvan by either: *failing to have a reasonable understanding of immigration law and procedure*; *or by intentionally misrepresent such.*

Paragraph 180: *Plaintiff relied on the multiple misrepresentations and outright fabrications of Defendants* when Plaintiff Catano Galvan agreed to pay Defendants for all services.

Paragraph 190: *As a result of Defendant Igbanugo's incompetence,* Plaintiff Catano Galvan has expended significant sums for both legal representation …

Paragraph 204: *Defendants engaged in deceit and/or collusion with the intent to harm each Plaintiff and to profit thereby.*

Paragraph 205: *Such acts evidence an improper motive and the commission of fraud.*

Paragraph 224: Plaintiffs' payments to Defendants were for contracts … *entered into by false inducement.*

Paragraph 226: Given the *misrepresentations Defendants used to extort the payments from Plaintiffs, and the negligence* in or failure to perform the agreed-upon services, it would be unjust to allow Defendants to retain these funds.

Paragraph 230: The Defendants *obtained and subsequently retained possession and control of Plain tiffs' funds under false pretenses.*

Paragraph 238: *Defendants utilized fraud, false pretense, false promise, misrepresentation, misleading statements, or deceptive practices in engaging in business with Plaintiffs.*

Paragraph 246: *Defendants made misrepresentations to Plaintiffs about Plaintiffs' qualification* for those applicable services.

Paragraph 247: *Defendants made misrepresentations to Plaintiffs about the timing, results, and efficacy* of those applicable services.

Paragraph 248: At the time of those *misrepresentations, Defendants were either aware of the falsity of those statements,* asserted such as their own knowledge without knowing the accuracy of the statements …

WHEREFORE, Plaintiffs respectively each demand judgment against Defendants as follows:

Demand 1: An order declaring any contracts as alleged between Plaintiffs and Defendants *entered into under coercion and false pretense;*

Demand 2: An order *enjoining Defendants from engaging in similar fraudulent, deceptive, or illegal conduct and business practices* as alleged in this matter;

Demand 5: Awarding Plaintiffs judgment and compensation in the amount of at least $50,000 .00 … including *claims for violating provisions of the Prevention of Consumer Fraud Act and negligent or intentional misrepresentation;*

135.    None of the above allegations are true – in fact, they are demonstrably false - and

reflects a complete disregard for a lawyer's ethical duty of candor to a tribunal. *(See Minn. R. Prof. Conduct Rule 3.1 Meritorious Claims and Contentions; Rule 3.3(a)(1): Candor toward the Tribunal; Rule 3.4(b) Fairness to Opposing Party and Counsel (falsify evidence, counsel or assist a witness to testify falsely, or offer an inducement to a witness that is prohibited by law); Rule 3.4(c) Fairness to Opposing Party and Counsel (Knowingly disobey an obligation under the rules of a tribunal); Rule 4.1 Truthfulness in Statements to Others; Rule 4.4 Respect for Rights of Third Persons; Rule 8.4(a) Misconduct (violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another); Rule 8.4(c) Misconduct (involving dishonesty, fraud, deceit or misrepresentation); Rule 8.4 (d) Misconduct (prejudicial to the administration of justice)).*

136.    The dishonest and unduly aggressive advocacy of Mr. Wilson et. al. in the *Onofre* matter was not rooted in the zealous representation of their clients, but rather clearly flows from the disdain that Mr. Wilson harbors for Plaintiff and his firm. It was unethical for Mr. Wilson and his associates to lie, mislead and fabricate testimony.

137.    The jury's take away from these false allegations is obviously that most lawyers are crooks which contributes to the bad opinion and disrespect the public have for lawyers. This is not helpful to the struggling image of the noble profession at all. There is absolutely nothing to admire in the spurious complaint and litigation.

138.    Mr. Wilson and Mr. Gavigan's Acknowledgement Dated 04/13/2016 States:

> I, Michael D. Gavigan, being duly sworn upon oath acknowledge that, pursuant to Minnesota Statutes section 549.211 (2016), *costs, disbursements, and reasonable attorney and witness fees may be awarded to the opposing party* or parties for actions commenced in *bad faith*; for any *claim or defense asserted that is frivolous and costly* to the other party or parties; for any position asserted that is unfounded or

presented solely to delay the ordinary course of the proceedings or *to harass*; or for any *fraud committed upon the Court*.

139.    Mr. Wilson should be held to the words in his acknowledgment if it has any meaning, because he made the false statements in his pleadings despite being in possession of evidence of Plaintiffs' stellar professional career and moral excellence.

140.    He also made the statements with the understanding that they would be published and distributed in national legal circles and social media. Mr. Wilson's written, defamatory statements injured Plaintiff in his trade and business, and have caused him to suffer severe mental anguish and substantial financial injury. (*See* Exhibits 1A & 94).

141.    Plaintiff cannot help but to believe that the extent of Mr. Wilson and Mr. Gavigan's professional disrespect of Plaintiff, as shown by the defamatory diatribe in the *Onofre* complaint, may well have to do with their own personal racial prejudices.

142.    Lawyers are very concerned about their reputations, and as the McKay Commission noted, "a lawyer's reputation is not only the basis for his or her livelihood, it is a cherished and integral part of the lawyer's life."[3]

143.    Mr. Wilson's pleadings evidenced failure to conduct a careful pre-filing inquiry such that sanctions should be imposed under the ethics rules, Fed. R. Civ. P. 11 and 28 U.S.C.S. § 1927 because Mr. Wilson et. al. continued to prosecute a defective litigation knowing full well that the lawsuit was legally frivolous.

144.    Mr. Wilson's conduct is also troubling because he had the intention of deceiving or misleading the Court into ruling in his favor. 28 U.S.C.S. § 1927 warrants sanctions when an attorney's conduct, "viewed objectively manifests either intentional or

---

[3] ABA COMMISSION ON EVALUATION OF DISCIPLINARY ENFORCEMENT, LAWYER REGULATION FOR A NEW CENTURY: REPORT OF THE COMMISSION ON EVALUATION OF DISCIPLINARY ENFORCEMENT 33 (1992) [hereinafter LAWYER REGULATION FOR A NEW CENTURY]. Note 5 at 38.

reckless disregard of the attorney's duties to the court." *Perkins v. Spivey*, 911 F.2d 22, 36, (8th Cir. 1990) (quotation omitted), cert. denied, 499 U.S. 920 (1991).

145.    And there was clearly a causal connection between the objectionable conduct of Mr. Wilson et. al., and multiplication of proceedings. The overall untrustworthy nature of the document has a cumulative effect that counsels this Honorable Court to find it repugnant to the very concept of candor to a tribunal.

146.    The dishonest complaint was created to inflict the maximum amount of injury to Plaintiff's professional reputation with the intent to crush Plaintiff with its great weight of misstated factual assertions and drown him in a sea of mendacity.

147.    Abusive litigation results in prolonged, repetitive harassment of Defendants, causing frustration and often extraordinary and unreasonable expenditures of time and money defending against unfounded claims, as was the case in the *Onofre* matter.

148.    Plaintiff has a right to be free from harassing, abusive, and meritless litigation. And this cause of conduct on the part of Mr. Wilson et. al. will likely continue unabated unless preventive measures in the form of financial sanctions are imposed by this Honorable Court as a deterrent to future bad conduct.

149.    On May 25, 2016, Plaintiff appearing pro se and through counsel, Jason A. Nielson, answered the *Onofre* complaint together with a Motion to Dismiss with Request for Sanctions, pursuant to Rule 11(b) of the Minnesota Rules of Civil Procedure, against Mr. Wilson for knowingly filing a frivolous action and for intentionally presenting a pleading to the Court for the improper purpose of harassment or embarrassment of Plaintiff's firm and the Plaintiff.

150.    Following trial, the jury – *not of Plaintiffs' peers* - inexplicably found in favor of *Onofre et. al.* in 4 general areas: 1) breach of contract; 2) consumer fraud; 3) emotional distress damages; and 4) legal malpractice. The jury verdict was fundamentally unfair and manifestly unjust, and shows the jury was misled by Mr. Wilson et. al.'s falsehoods and prejudice against Plaintiff. (*See* Exhibit 5, 51, 52, & 53).

151.    On December 19, 2017, Plaintiffs brought a Motion for JMOL/New Trial, justifiably alleging horrendous errors. On or about February 13, 2018, the Trial Court denied said Motions.

152.    On or about March 5, 2018, Mr. Wilson brought a motion for Amended Findings requesting an injunction (a prerequisite to award of attorney's fees) and attorney's fees in the amount of $84,000.00. On or about April 3, 2018, the Trial Court denied the Motion.

153.    Plaintiffs filed an appeal and Mr. Wilson et. al. counter-appealed on the issues of injunctive relief and attorney's fees. On May 20, 2019 the Appeals Court affirmed the District Court's decision in all respects.

154.    Plaintiff filed a timely petition for review with the Minnesota Supreme Court and lamented that:

> What the Appeals Courts' decision portends for viability and/or enforceability of written attorney-client fee contracts is alarming and conflicts with a clear judicial directive from this Court dating back to *Hoy v. Nichols* 170 Minn. 191; 212 N.W. 530 (1927), holding that parol evidence is inadmissible to vary or add to the terms of an attorney-client fee contract…
>
> The Appeals Court's decision is also in conflict with the venerable standards enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984) in the context of an ineffective assistance of counsel claim …

… The law is clear that counsel cannot be ineffective for failing to accurately forecast a change in the immigration laws. *United States v. Agoro*, 996 F.2d 1288, (1ˢᵗ Cir. 1993). Also *see Valenzuela v. United States,* 261 F.2d F.3d 694, 700 (7ᵗʰ Cir. 2001) (finding ineffective assistance of counsel argument "meritless because our cases provide that "that the Sixth Amendment does not require counsel to forecast changes or advances in the law"" (quoting *Lilly v. Gilmore*, 988 F.2d 783, 786 (7ᵗʰ Cir. 1993)) …

155.    By Order dated August 20, 2019 the Minnesota Supreme Court declined discretionary review.

156.    The professed theory of *Onofre*'s case stretches credulity, especially when on a yearly basis Plaintiff does five to ten times the $25,000.00 amount in controversy in deliberate and/or compelled pro bono legal work for indigent clients (*See* Exhibits 1A & 18).

157.    The contention that Plaintiff set out to swindle the three Hispanic clients of approximately $25,000.00 is truly farcical, mind-boggling, and shocks the conscience. Little else can explain the defamatory claims contained in the complaint other than Mr. Wilson's long-standing sick grudge against Plaintiff.

## X.    EXCULPATORY DEPOSITION TESTIMONIES OF MS. ONOFRE CEDILLO, MS. CATANO GALVAN, & MS. DELGADO

158.    Ms. Onofre Cedillo, Ms. Catano Galvan, and Ms. Delgado testified at trial that Plaintiff met with them on two to three occasions each, with only them and their daughters as interpreters, and promised and/or guaranteed that he would get them green cards within six months. This is plainly not true.

159.    They were coached to claim that none of the law firms Spanish speaking paralegals, that would always be present as case managers to interpret and enter case notes after client meetings, were present, which is again not true.

160.    Significantly, while they provided this perjured testimony at trial, they did not make

this claim in their verified complaint (*See* Exhibit 5), in their depositions, (*See* Exhibits

41-43) nor was it contained in the firm's OnDocs report/case notes (*See* Exhibit 13),

which document who attends client meetings.

### a. Alejandra Catano-Galvan

161.    Below, Ms. Alejandra Catano Galvan at the outset of her deposition confirms

Plaintiff's reputation as a good lawyer:

> Page 12:
>
> Q    (BY MR. IGBANUGO)  And how did you meet me?
> A    You renewed my daughter's dad permit, work permit.
> Q    Okay.  Was that all I've done for you or any – Was it all I've done
> for any member of your family, until the last time you hired me to do
> your work?
> MR. GAVIGAN:  Objection.  Confusing. You can answer.
> *A    You worked with my family because you're supposed to be a really
> good lawyer.*

162.    Below, Mr. Wilson's associate counsel further objects to Plaintiff's questioning to

cloak the fact that it was Wilson Law Group that concocted the defamatory allegations

in the complaint to the effect that Plaintiff fabricated falsehoods to dispossess them of

their money paid as legal fees.

> Page 21:
> Q    (BY MR. IGBANUGO)  So did you tell your lawyer that I made
> things up and fabricated  information to take your money?
> MR. GAVIGAN:   Objection.   That question calls for privileged
> attorney-client communications. Don't answer that question.

163.    Below, Mr. Wilson's client admits that Plaintiff did not give her any guarantees.

> Pages 32-37:
> Q    *What did I promise with the papers?*
> A    *You said you would fix my papers*, that if there was something you
> were not going to be able to do you would let me know in advance.
> Q    *Did I guarantee you that your papers would be fixed?*

A   *You said they would.  And I knew you were one of the best lawyers here in Minnesota, so I trusted you.  Yes.*

Q   (BY MR. IGBANUGO) *Did I guarantee you that I'm going to get you a green card within a specified time?  Six months?  Twelve months?  One year?*

MR. GAVIGAN:   And objection.   Asked and answered. You can answer.

A   *You didn't specify a time,* but you did assure her that you would get her.

Q (BY MR. IGBANUGO) *Did I tell you that I'm going to get you a green card within a specified time, six months or 12 months?*

Mr. Gavigan: Same objection. You can answer.

A   *You did not specify a time, but you said that it was possible.*

164.    Below, Ms. Catano Galvan affirmed Plaintiff's good reputation, thereby confirming

the undue influence exacted by Mr. Wilson et. al. to convince them to support the false

complaint. It also establishes that no other attorney instructed or even suggested that

they sue Plaintiff, other than the Wilson Law Group, as outlined below.

Page 47

Q   …Up until the time you fired me, did you ever send me any clients or refer any clients to me?

A   Yes.  Yeah, I recommended people.

Q   *Why did you recommend me?*

A   *Because I knew that you were a good lawyer.*  I don't know what happened in my case, but –

Q    Would you send me a client today, after you fired me and hired Wilson?

A   *I don't know what happened in this case, but there are people who like the work you do, and I never say any bad things about you.*

Q   Okay.  Thank you for that.

Page 47

Q   (BY MR. IGBANUGO) Okay.  But I gave you a guarantee?

A   *I was very confident, and I don't know what happened.*

Q    Okay.  Confident because of my reputation as a good lawyer or confident because I gave you a guarantee?

A   *Both.  Because you said you would – because you were known as a good lawyer and because you said you would get it.*

Page 49

Q   *Has De León & Nestor said anything to you about possible changes in the immigration laws?*

A   *Yes.*

Page 13

Q   (BY MR. IGBANUGO)  *As part of their help that they're giving you, in representing you, have they told you that they are going to depend and hope that the law, immigration law changes in the future?*
A   *Yes.  I know there's some changes in the law.*
Q   (BY MR. IGBANUGO) *In part they are basing their defense on the possible changes.  Is that true?*
A   *Yes.*
Page 55
Q   *Okay.  Has any other lawyer, other than Wilson Law Group and Mr. Gavigan, ever advised you to sue me?*
A   *No.*

### b.   Olimpia Onofre Cedillo

165.   The excerpts below show that Ms. Onofre Cedillo was quite combative during her deposition, but confirms that Plaintiff discussed changes in the immigration law with her as a possible avenue of relief. Ms. Onofre Cedillo admitted that Plaintiff only gave her ***the impression*** that he would be able to obtain a green card for her, as opposed to 100% guarantee.

Page 29
Q   *Okay.  Throughout the time that I represented you, did I ever mention anything about any future changes in immigration law?*
A   *Yes.*
Page 39
Q   What type of harm have you suffered because of *all this fabrications and fraud and big lies I committed on you?*
A   Do I have to respond to that?
MR. GAVIGAN:  You can answer that question.
A   First, it was very painful, 'cause I was – *I was under the impression that – or you gave me the impression that I would be able to get my legal status here, and after –*
Page 40
Q   *Have you ever felt any threat that you're going to be deported or arrested by the immigration department?*
A   *No.*

### c.   Maria Delgado

166.   Below Ms. Delgado proves herself to be a prolific liar by going as far as to deny having entered the United States as a "wave through" and having a U.S. citizen

boyfriend or fiancé she had planned to marry, which Plaintiff had relied on in executing

a fee agreement for filing a Form I-130. She also denied knowing what DAPA is, when

an email letter from her own daughter, Araceli, clearly says otherwise. (*See* Exhibit 39).

Page 23

Q    (BY MR. IGBANUGO)  Do you recall that … you told me that you came to the United States in a car and that you were waved through inside the car, you were inspected by an immigration officer?

A    I don't recall.

Q    *Did you ever have a U.S. citizen boyfriend?*

A    *I can't answer that question.*

Q    *You have to answer the question.*

A    *No.*

Page 26

Q    (BY MR. IGBANUGO) *You state in this document that I intentionally misrepresented information to take your money. Is that true?*

A    *No.*

Q    *On item 124 of this document you said, Plaintiff relied on the multiple mis-representations and outright fabrications of Defendants when Plaintiff agreed to pay Defendants for all services. Is that true? Page 13, item 124.*

A    *Who is the plaintiff?*

Q    *You're the plaintiff, I'm the defendant. So you said that you relied on my multiple misrepresentations and outright fabrications to give me money, that I lied to you and fabricated documents for you to give me money. That's what you said. Is that true?*

A    *No.*

Q    *That's what you say here in your case. You're suing me. You're saying to the Court, under oath and verification, that you relied on me, telling you multiple misrepresentations and outright fabrications, and that's what you relied on to give me money, because I made things up and lied to you and fabricated things and defrauded – to defraud you, and that's – and that's why you want to get three times the amount of money. Is that true?*

A    *I don't know how to respond to that.*

Q    *You have to answer yes or no.*

A    *No.*

Page 33

Q    (BY MR. IGBANUGO) *Have you ever had a U.S. citizen fiancé?*

A    *No.*

Q    Do you know why your daughter, Araceli, would send me an e-mail saying that you have a U.S. citizen fiancé that you're planning to marry?

A   No.

Page 36

Q   Okay.  Have you heard of something called *DAPA?*

A   That never existed, did it?

Q   Yes, it did.  *Did you ever hear of it?*

A   *No.*

Q   *Do you know why your daughter would be sending me an e-mail telling me that you want to fix your case through DAPA before you consider marrying your U.S. citizen fiancé?*

A   Yes, but I haven't worked on that since then.

Q   Okay.  *You never heard about DAPA before, but now you know that your daughter sent me an e-mail saying you want to fix your case through DAPA before marrying a U.S. citizen; is that correct?*

A   *I did say I heard about* – I heard about it, but I haven't worked on that.

Q   Did you at any point tell your daughter to tell me that you want to fix your case – fix your case through DAPA first before considering going about it through the petition she filed for her or a U.S. citizen fiancé?

A   Yes, but I never got any help anyway.

Q   *But did you ask your daughter to send me an e-mail saying you want to fix your case first through DAPA?*

A   *Yes.*

Q   (BY MR. IGBANUGO)  *Why did you and your U.S. citizen boyfriend break up?*

A   *I haven't had a boyfriend.*

Q   *Last time it was personal, but now you haven't had a boyfriend.*

A   *Yeah.  I feel like these are personal questions that are not relevant to the case.*

Page 47

Q   Okay.  *In bringing this lawsuit – You have said you never talked to any other lawyers.  So in bringing this lawsuit you've relied and represent on the advice you got from Mr. Gavigan and the Wilson Law Group?*

A   *Yes.*

167.   Nowhere in the above deposition excerpts did any of the three Hispanic clients

claim as they were coached to do at trial that Plaintiff met with each on 2-3 occasions

with only their daughters present (that is, outside the presence of Plaintiff's Spanish

speaking staff, which never happens) and promised or guaranteed them green cards

within six months. (*See* Exhibits 41-43).

168.    The firm's OnDocs Report reflects that Plaintiff met with and signed fee agreements with Ms. Onofre Cedillo on August 27, 2013, with Ms. Delgado on September 18, 2013, and with Ms. Catano Galvan on August 15, 2011.

169.    And as is always the case, because Plaintiff does not type, a firm Spanish speaking paralegal was sitting next to his desk typing. Plaintiff has never and would never meet with a Spanish-only speaking client without the aid of a firm Spanish speaking paralegal, even if they brought their own friends or family members as interpreters for precisely the very reason implicated in the *Onofre* case.

170.    The OnDocs Report further reflects that Plaintiff subsequently met with Ms. Onofre Cedillo twice, and not alone. It reflects that on 9/2/2015, "HAI/JAN & MB met with Olimpia, her husband Victor and daughter Michaela." In this instance, HAI stands for Herbert A. Igbanugo, JAN stands for Jason A. Nielson, and MB stands for Margarita L. Briseno. It further reflects that Plaintiff met with them again on 6/3/2014, and the case notes reflect that "HAI & JAN met with Olimpia and Michaela." (*See* Exhibit 13).

171.    In the case of Ms. Catano Galvan, the OnDocs Report establishes that Plaintiff never met with her again after the initial meeting and the execution of the fee agreement on August 15, 2011. These are records kept in the ordinary course of business, and they do not lie. (*See* Exhibit 13). It is not a perfect system as it is imaginable that a paralegal may forget to enter meeting case notes directly after the meeting or same day, but that is very, very rare, but late entries are permitted with admonition as they are better than no entries at all.

172.    In the case of Ms. Delgado, OnDocs Report reflects that subsequent to the meeting in which the fee agreement was signed, Plaintiff only met with them once on

49

12/23/2014, and the case notes reflect that, "HAI & JAN met with Maria and Araceli." (*See* Exhibit 13).

173.   Mayra Medina was employed with Igbanugo Partners Int'l Law Firm from September 3rd, 2013 until July 8th, 2015. Margarita Briseno was employed with Igbanugo Partners Int'l Law Firm from November 12th, 2012 until October 1st, 2015. The two Spanish speaking firm paralegals were scheduled to testify at the hearing, slated for a three day time slot by the Court.

174.   However, Mr. Wilson's associates, Mr. Gavigan and Ms. Rodelius took four and a half days to present their case, and neither of them (Medina and Briseno) were available to testify due to employment constraints when Plaintiff finally presented his case or defense on the 5th and 6th day, by which time the Judge and Jury had become very impatient.

175.   Plaintiff believed the documentary evidence of record was sufficient to establish that Mr. Wilson et. al. and the Hispanic clients presented perjured testimony when they claimed that Plaintiff met with each of them without firm interpreters and guaranteed them green cards within six months. These were lies fabricated by Mr. Wilson to defeat the documentary evidence of record to the contrary.

176.   Plaintiff is always categorical in disclaiming any guarantees whatsoever as to time and result. To do otherwise, obviously violates the rules of ethics and is a prescription for disaster every time. Even a buffoon of a lawyer knows this and gets this point.

177.   However, because clients usually insist on getting an idea of how long it would usually take or how long it has taken in the past to process immigration benefit applications and it calms them down, Plaintiff would normally point clients to USCIS'

posted processing time estimates, available on USDHS' website (*See* https://egov.uscis.gov/processing-times/).

178.   For instance, for Form I-130 Immigrant Visa petitions at the time period in question, it was taking approximately six months from the time of filing to obtain a decision according to the website, and Plaintiff would have looked it up and said so to the clients, and would even swing his computer screen around for them to see with their own eyes.

179.   In the *Onofre* case, the Form I-130 Immigrant Visa Petition was filed on November 19, 2013 and was approved on May 22, 2014. In *Delgado's* case the I-130 was filed on November 22, 2013 and approved on April 30, 2014. In the case of *Catano Galvan*, the I-130 was filed on June 23, 2014 and approved on December 10, 2014. So, Plaintiff's predictive accuracy was sound, consistent with USCIS' published time estimates. (*See* Exhibit 13).

180.   Plaintiff clearly explained to each of them that this was just the first step. So, Plaintiff is confident that the allegation of promising green cards in six months was the dirty work of David Wilson in his continuing efforts to harm Plaintiff.

181.   Plaintiff sadly notes that the three Hispanic clients had completely lost their innocence at the time of trial and lied under oath under the tutelage of Mr. Wilson et. al. Upon information and belief, Mr. Wilson et. al. corrupted them morally and appealed to their sense of greed and self-interest.

182.   David Wilson improperly used confidential attorney-client information for impeachment purposes, his witness testified to prejudicial information previously ruled

inadmissible by the Court in its Order in Limine, and he strategically purveyed false testimony.

183.    Further, the consumer fraud claims were spurious and was obviously interposed and motivated by David Wilson's desire to be awarded attorney's fees, which the District Court appropriately denied. (Also, *See* Exhibit 56).

184.    Ms. Onofre Cedillo testified that three other attorneys told her that she did not qualify for relief, but she thought Plaintiff would be able to help because he is a "great attorney." That he said he would help her and nobody else told her that.

185.    Maria Delgado testified that she spoke to Esteban Rivera, who was an attorney with Igbanugo Partners, and he told her she did not qualify for immediate relief.

186.    Ms. Catano Galvan testified that she was confident Appellant could "fix" her status because of his good reputation. (*See* Exhibits 41-43).

187.    Mr. Wilson escalated what should have been a Conciliation Court matter (at best) into a very expensive and time-consuming civil litigation, and then had the effrontery to request an obnoxiously high amount of $84,000.00 in attorney's fees after flagrantly violating the letter and spirit of Minn. R. Civ. P. 1.

188.    It is also vile that Mr. Wilson contracted with these clients to receive a whopping 38% of any awards while at the same time professing that doing a public good was his sole motivation for bringing the spurious lawsuit.

## XI.    MR. WILSON'S UNETHICAL USE OF CONFIDENTIAL & PRIVILAGED INFORMATION OF DYAN WILLIAMS FOR IMPEACHMENT PURPOSES

189.    At trial, Mr. Wilson et. al. conspired to use confidential attorney-client information in an attempt to impeach Plaintiff's expert witness Dyan Williams. *(See* Exhibit 9-10)

This information was undoubtedly obtained by David Lee Wilson by way of a breach of the ethics rules. This is also proof positive that David Lee Wilson illegally downloaded (stole) Plaintiff's proprietary data just before he and Ms. Buteyn left Plaintiff's old firm, Blackwell Igbanugo P.A.

190.    While at Blackwell Igbanugo, David Wilson was the attorney for Dyan Williams, who was also an employee of Blackwell Igbanugo, who needed legal services with respect to her immigration status. As explained in the Affidavit of Dyan Williams supported with exhibits (*See* Exhibits 9-10), David Wilson represented her and Plaintiff's old firm Blackwell Igbanugo (such dual representation is common in filing petitions/applications with USCIS) when she filed her employment based visa petition with immigration services in 2002.

191.    Specifically, during cross-examination, Mr. Gavigan attempted to impeach Ms. Williams with information that was undoubtedly obtained by Mr. Wilson and Ms. Buteyn by way of a breach of the ethics rules.

192.    David Wilson clearly violated his ethical obligations to Ms. Williams and Plaintiff pertaining to past representation. If he did not violate the attorney-client privilege, he certainly violated Rule 1.5 of the Minnesota Rules of Professional Conduct by divulging confidential information to Mr. Gavigan and Ms. Rodelius, who should have known better than to use such information for impeachment purposes.

193.    Even worse, Mr. Wilson's employee used that confidential information against Mr. Wilson's former clients to benefit his current clients, presumably without informing any of his clients about the conflicts of interest involved with representing them in the

*Onofre* matter where his former client would be a witness for the opposing party who was his prior employer.

194.     What is the most egregious of all is that Mr. Wilson provided that information for the explicit purpose of impeaching his former clients, and when Mr. Wilson and Mr. Gavigan were asked about this by OLPR, they lied in violation of MRPC 8.1(b).

195.     As explained, in Ms. Williams affidavit (*See* Exhibit 9-10):

> … The precise point this paragraph raises, is that either both Mr. Wilson and Mr. Gavigan are lying, or that Mr. Gavigan must be a psychic to have guessed correctly what LCA corresponded to Ms. Williams out of the three filed by Blackwell Igbanugo. *The point is that this information is not available to the public as described below in the Affidavit of Dyan Williams.*
>
> > *34. The identity of the beneficiary for an H-1B filing or LCA filing cannot be accessed and is not readily available through any public records* … The LCA itself does not list any information on the potential beneficiary. Yet Mr. Gavigan claims that based on his finding several LCA postings by Mr. Igbanugo's firm in 2002, he corroborated his initial conclusion that one was for me. (See Mr. Gavigan's response at page 2, last paragraph). Despite stating he "did not know which specifically corresponded to Ms. Williams," *he submitted the immihelp.com report showing the case number for the LCA that matches the one Mr. Wilson filed with the H-1B.*
>
> I trust the Office of Lawyers Professional Responsibility to *fully and fairly review* any ethics complaint being filed by Mr. Igbanugo and/or Mr. Maher in connection with the violations of professional responsibility rules I described in this affidavit. *I trust that Mr. Igbanugo's disciplinary history and my prior employment at his firm will not cloud the OLPR's judgment or negatively affect its view of my claims.* Affidavit of Dyan Williams, paragraph 52.

196.     But Ms. Halloran conducted a sham investigation and declined to sanction Mr. Wilson and his associates to the detriment of Plaintiff, and in violation of his constitutionally bestowed civil rights.

### XII.   OTHER SERIOUS ETHICAL VIOLATIONS BY MR. WILSON
AND HIS ASSOCIATES

#### a.   Forbidden Testimony About Plaintiff's Past Professional Discipline

197.    Plaintiff brought a Motion in Limine prior to trial to exclude evidence of his past professional discipline. The Court granted that motion, stating that the probative value far outweighed its prejudicial effect. The District Court Judge specifically stated, "The Court finds that direct evidence of Defendants' past professional discipline is inadmissible under Minnesota Rules of Evidence 404(a), and also that the probative value of such evidence is far outweighed by its prejudicial effect under Minnesota Rule of Evidence 403."

198.    Nevertheless, Mr. Wilson's very first witness testified about a problem with Plaintiff's "license." This momentous disclosure was intentionally and unethically elicited by Mr. Gavigan as follows:

> Q: After that conversation, what happened in the case?
> A: Nothing happened. *We received that letter in the mail that his license was* –
> Q: Okay. You received a letter in the mail and then what happened?
> A: And then we received that letter, and then that's when I went to somebody else to seek advice as why it was taking so long or to see what else we could do for my mom. (*See* Exhibit 4).

199.    At that point, Mr. Gavigan interrupted the witness, further highlighting the remark of the witness. The reaction to the witness following her uttering the words, "We received that letter in the mail that his license was____," (covering her mouth with her right hand in an "oops" fashion) and the momentary but stunning or pregnant silence that followed undoubtedly biased the jury against Plaintiff.

200.    The Court ordered that Plaintiff's bad relationship with David Wilson be excluded. Plaintiff abided by the Court's orders. His counsel did not even question Ms. Williams

about her relationship with David Wilson who actually helped her gain employment at Blackwell Igbanugo, PA, because it might have been violative of the Court's order. David Wilson's firm was far less scrupulous and unethically guided their witnesses to bring up matters the court ordered them not to raise.

201.    Under the circumstances, Plaintiff would have been quite happy to discuss his disciplinary history so that the jury could hear the whole story which includes David Wilson's personal vendetta against him (spanning more than 15 years), a vendetta that led him to callously and serially violate the rules of ethics during the trial.

202.    The District Court should not have allowed its processes to be abused in this manner, and the OLPR as the designated "watch dog" of attorney conduct ought to have weighed in with appropriate sanctions to deter Mr. Wilson, et al. from indulging in this type of unethical conduct in the future.

203.    In both Plaintiff's personal and professional life he is always guided by the Biblical teachings that, "For we shall all stand before the judgement of God… So then each one of us shall give account of himself to God," (Romans 14:10, 12: CF. 2 Corinthians 5:10); "The Son of Man is going to come with his angels in his Father's glory, and then he will repay everyone according to what he has done." (Matthew 16:27).

204.    Mr. Wilson et. al. are the ones that have perpetrated a fraud upon the Court in their unjust use of the legal system to further a sick and depraved vendetta that has lasted well over a decade. It is time to put a stop to Mr. Wilson's attacks, especially now that he is using the Courts to continue with his longstanding vendetta.

**b.  Extremely Prejudicial and Unethical Trial Conduct**

205.     Also, extremely prejudicial statements made by their counsel Mr. Wilson et. al.
during the trial, particularly those during their opening statement and closing argument,
clouded the jury's perspective and ability to consider all the evidence fairly, and had a
prejudicial effect on the jury's consideration of the entire matter.

206.     Lawyers are required to show candor to the Court, to be fair to opposing counsel
and litigants, and to comply with the interests of justice as a whole while trying cases.
The false statements and arguments at trial poisoned the entire proceedings. Such
prejudice resulted from the name calling associated with the defamatory courses of
action of consumer fraud and deceit in claiming that Plaintiff made what amounts to
"fly-by-night" promises of results and timing to these Hispanic clients to swindle them
out of approximately $25,000.00.

207.     The deposition of Ms. Onofre Cedillo, Ms. Catano Galvan, and Ms. Delgado
establishes that none of them understood the basis of their suit as contained in their
*verified complaint* or the factual and legal claims contained within the lawsuit. (*See*
Exhibits 41-43). Mr. Wilson's spurious claims in the lawsuit were intentional and done
with malice.

### XIII.     FALSE AND/OR DISHONEST EXPERT REPORT OF PURPORTED "EXPERT" BRIAN AUST

#### a.   Olimpia Onofre Cedillo

208.     The false "expert report" of purported immigration law expert Mr. Brian Aust
*(Onofre matter being his first ever as an expert in U.S. immigration laws)* which
enabled Mr. Wilson to bring this sham lawsuit in the first instance is substantially
different than his trial testimony elicited under the pressure of cross examination. In his

report, he dishonestly claimed with respect to Olimpia Onofre Cedillo that (*See* Exhibit

51):

> The I-130 that plaintiff's daughter filed on plaintiff's behalf *had no tangible value to plaintiff* …
>
> *The I-130 revealed plaintiff's unauthorized presence in the United States to government authorities, thus risking her detention and possible removal from the United States…*
>
> It is my opinion that the I-130 *left plaintiff in a worse off position,* both legally and personally, had she not even entered into the contract for services with defendants. *The only conclusion that I can reach under the circumstances is that defendant's conduct was in dereliction of the applicable standard of care and was the direct and proximate cause of harm to plaintiff …*

### b.  Maria Delgado

209.    With respect to Maria Delgado, Mr. Aust lied that:

> It is my opinion that *the I-130 left plaintiff in a worse off position*, both legally and personally, had she not even entered into the contract for services with defendants. The only conclusion that I can reach under the circumstances is that *defendants' conduct was in dereliction of the applicable standard of care and was the direct and proximate cause of harm to plaintiff.*
>
> The agreements *lacked an underlying basis in fact and law* and should not have ever been entered into by defendants with the plaintiff.

### c.  Alejandra Catano-Galvan

210.    And finally, regarding Alejandra Catano Galvan, Mr. Aust testified falsely that:

> The I-130 that plaintiff's daughter filed on her behalf *had no tangible value to plaintiff* …
>
> *The I-130 revealed plaintiff's unauthorized presence in the United States to government authorities, thus risking her detention and possible removal from the United States* … it is my opinion that a reasonable attorney exercising proper care in these circumstances would not have entered into the agreement for services that defendants did.

*…The actions taken by defendants were harmful to plaintiff in the expenditure of unnecessary funds and exposure to federal immigration authorities who were made aware of her unauthorized presence in the United States when the I-130 was needlessly filed. It is my opinion that the I-130 left plaintiff in a worse off position,* both legally and personally, had she not even entered into the contract for services with defendants. The only conclusion that I can reach under the circumstances is that *defendants' conduct was in dereliction of the applicable standard of care and was the direct and proximate cause of harm to plaintiff.*

## XIV.    BRIAN AUST'S CONTRADICTORY TRIAL TESTIMONY AND RELATED VIOLATION OF ETHICS RULES

211.    At trial, Mr. Aust testified that Plaintiff's conduct complied with four relevant standards of care. Specifically, contradicting the opinion from his expert report, Mr. Aust testified that there is not unanimity in the immigration lawyer's community as to whether it is a breach of the standard of care for an immigration attorney to enter into a contract for a "stand-alone I-130." He also testified that the large and bold disclaimer language in Plaintiff's contracts (regarding not guaranteeing favorable results and timing of completion) complied with the applicable standard of care for lawyers practicing immigration law.

212.    Brian Aust simply lied in his expert report to permit this fraudulent case to go forward in the first instance, but capitulated under pressure of cross examination to give testimony that contradicts his report and was somewhat more consistent with the contents of the real expert reports of R. Leo Pritschet, Esq. and Dyan Williams, Esq. (*See* Exhibits 7-8).

213.    Mr. Wilson and his dishonest associates tossed an "unholy hail Mary" hoping the jury of simple folks would "buy it", and they did so unfortunately because of the fraud perpetrated on the court and jury by Mr. Wilson el. al.

214.    Mr. Wilson intended for his malicious and vicious lies contained in the pleadings to be continuously repeated and widely disseminated by word of mouth and internet. *See*: https://www.leventhalpllc.com/too-lousy-a-lawyer-to-commit-malpractice/. This reputational damage has also made it very difficult for Plaintiff to attract corporate clients. (*See* Exhibit 94).

## XV.    POST-*ONOFRE* TRIAL CROSS COMPLAINTS TO MINNESOTA OLPR AND THEIR OUTRIGHT REFUSAL TO INVESTIGATE MR. WILSON, MR. GAVIGAN, MS. RODELIUS, MS. BUTEYN, AND MR. AUST

### a.    Mr. Wilson and Mr. Gavigan's Post-*Onofre* Ethics Complaint

215.    On June 19, 2018, Mr. Wilson et. al. filed an ethics complaint filled with the falsehoods and vicious lies contained in the *Onofre* complaint against Plaintiff, which was stamped received by OLPR on June 26, 2018 (*See* Exhibit 58). Amongst the wickedly false statements in the complaint are the following:

> Pursuant to Minnesota Rule of Professional Conduct 8.3, I write to report conduct by attorney Herbert Igbanugo (Atty Reg. No. 0191139) *which raises substantial questions as to his honesty, trustworthiness, and fitness as a lawyer in several respects…*

> The claims at issue in the underlying matter *centered on conduct evidencing professional negligence and fraud.*

> *As part of his sales pitch, Mr. Igbanugo essentially guaranteed* that he could get residency for Ms. Onofre through this I-601A process, *and also guaranteed a timeframe* by which Ms. Onofre would have it.

> Again, *as part of his sales pitch, Mr. Igbanugo essentially guaranteed that he could get residency for Ms. Delgado* through this process, and *stated' a timeframe* by which Ms. Delgado would have it.

> It is understood that competence is not the same as neglect. *Mr. Igbanugo's lack of awareness of basic tenets of the law surpasses mere negligence... He failed to exercise even a modicum of legal knowledge* when repeating this fundamental error. In his deposition, he even *revealed his ignorance* as to how the I-601A process came to be.

At best, these factors indicate unreasonable delay in the performance of Mr. Igbanugo's duties as counsel for Complainants. At worst, *these factors demonstrate an intent to mislead and defraud Complainants.*

*He should not have promised them specific outcomes and timelines which he could not ensure.* His oral declarations carried much greater weight over the course of the representation than the statement *embedded* in the fee agreement acknowledged at the inception of the representation. *His failings indicate a lack of candor, or diligence, in communications with Complainants.*

While attorney Igbanugo *technically did not file or initiate proceedings* on the most problematic portion of the contemplated and impossible services for Complainants, *he did take substantial steps to advance frivolous claims …*

*…* in many cases, *that conduct also constituted presentation of false statements of fact or law, or the offering of false evidence, to the Court.*

*Mr. Igbanugo falsely represented* to and assured each Complainant that they qualified for and would obtain relief through the Provisional Waiver process.

*Had attorney Igbanugo simply stated the truth* in his initial dealings with Complainants, that they did not presently qualify for relief, all of this could have been avoided.

216. Plaintiff has never ever promised or guaranteed a result or time of case completion to a single client in his 32+ year legal career (*See* Exhibits 36, 38, & 40) (*Also see* Exhibit 1A, Plaintiff's Affidavit Paragraphs 9, 10, 12, 37, 69-74). The disclaimer language is in bold, capital letters in Plaintiff's fee agreement, is prominent and not "embedded" in the document as falsely claimed by Mr. Gavigan.

217. Mr. Wilson and Ms. Buteyn are a morally bankrupt couple that stole data and funds from Plaintiff which enabled them to start an immigration law firm, and have unfairly attacked him over the past 15 years for no just cause other than his hurt feelings from being held accountable for his theft and other unethical behavior at Blackwell Igbanugo.

**b. Plaintiff's Post-*Onofre* Ethics Complaint**

218.   By cover letter dated August 9, 2018 Plaintiff filed his own ethics complaint against Mr. David Lee Wilson, Ms. Cassondre Buteyn, Mr. Michael Gavigan, Ms. Eva Rodelius, and Mr. Brian Aust, strenuously detailing by affidavit the plethora of ethics violations by the group (*See* Exhibit 1A). Plaintiff implored the OLPR to investigate the matter stating:

> I pray that you will *conduct an extensive investigation in this matter to include interviewing all of the three individual Plaintiffs and their children/family member witnesses as I believe that somebody may tell the truth about being coached to lie by their lawyers from the Wilson Law Group.* I also respectfully implore your office to contact Dyan Williams, Esq. who along with my firm and I are the victims of Mr. Wilson's chicaneries and machinations.

219.   However, on October 8, 2018 Ms. Halloran denied and/or dismissed the Complaints against Ms. Buteyn, Ms. Rodelius, and Mr. Aust without opening an investigation (*See* Exhibit 62). With respect to Mr. Wilson and Mr. Gavigan, the OLPR opened investigations and requested a response to Plaintiff's complaint. Both Mr. Gavigan and Mr. Wilson coordinated and responded to Plaintiffs' complaint telling another assortment of lies as is their modus operandi.

220.   Plaintiff filed a reply as requested by the OLPR, but on September 25, 2019 without any investigative activity or more inquiries the OLPR also dismissed the investigations against Mr. Wilson and Mr. Gavigan, eviscerating Plaintiff's civil rights in the process (See Exhibit 72 & 73). However, Ms. Halloran has continued to hound, oppress, intimidate, harass, and abusively investigate Mr. Wilson/Mr. Gavigan's spurious ethics complaint against Plaintiff till this very day.

221.   Numerous requests for additional evidence and responses have been exchanged between Plaintiffs and Ms. Halloran. For instance, on December 18, 2018 in response

to a Request for Additional Evidence from the OLPR, Plaintiffs' implored OLPR

Director as follows:

> … While I do clearly understand that you have determined not to open an investigation into the conduct of Cassondre Buteyn and Eva Rodelius at this time, *could you at least ask them a formal question as to whether they had prior knowledge of the plan of Mr. Wilson and Mr. Gavigan to use confidential attorney-client information to impeach Dyan Williams. I do not believe Mr. Wilson and Mr. Gavigan are bright enough to have kept it to themselves.*
>
> While it is up to the OLPR to determine who to investigate, and who has violated the rules of ethics, *as a victim I again respectfully request/suggest that at the very least your office should inquire of Ms. Rodelius, who was co-trial counsel, as to whether she was aware of the unethical trial strategy at issue in this complaint.* It appears to me that as co-trial counsel, she was part and parcel of the team's legal strategy to utilize Dyan Williams' privileged information for purposes of cross-examination.
>
> … *All I ask is that you at least ask the questions of the two, and I will be quite satisfied with the effort, even if it does not yield the true answer or result I expect. But I do not believe that Ms. Rodelius will risk her young career in covering for Mr. Wilson,* especially if she is assured that an investigation will not be opened against her.

222.    In another response to request for additional information dated January 8, 2019

Plaintiff again beseeched or pleaded with the OLPR as follows:

> Also, *I am using this opportunity to again respectfully implore you not to shut off a crucial line of inquiry in this investigation that I sincerely believe could be very fruitful, and all I am asking is that you pose one simple question to both Cassondre Buteyn and Eva Rodelius as to their prior knowledge of the unethical endeavor…*
>
> Specifically, in Amy Mahowald's letter of October 8, 2018 (*See* Exhibit 63) declining to investigate Ms. Rodelius, she specifically stated:
>
>> In your submission against Ms. Rodelius you basically allege that she was aware and agreed with her co-counsel's conduct in the trial. *This information did not give rise to a reasonable belief that Ms. Rodelius'*

> *conduct itself gave rise to a violation of the Minnesota Rules of Professional Conduct.*
>
> *Please note the Director's Office is not treating your submission as a complaint, has not opened a file or initiated an investigation in this matter, and the Director presently intends to take no further action as it pertains to your submission.* Thank you for your attention to this matter.

However, in my letter of December 18, 2018 responding to your request for additional evidence, I requested as follows:

> While it is up to the OLPR to determine who to investigate, and who has violated the rules of ethics, as a victim *I again respectfully request/suggest that at the very least your office should inquire of Ms. Rodelius…*
>
> *… But I do not believe that Ms. Rodelius will risk her young career in covering for Mr. Wilson, especially if she is assured that an investigation will not be opened against her.*
>
> *… Not doing so will unfairly or prejudicially hinder or shut off a line of inquiry with a strong possibility of eliciting decisive information in this matter.*

223.    But every effort to get Ms. Halloran to show evenhandedness or impartiality in handling the cross-complaints fell on deaf ears which is quite suggestive of her tacit complicity in Mr. Wilson et. al.'s unethical campaign of disparagement against Plaintiff.

## XVI.    APPEAL OF ADVERSE DECISION OF THE OLPR DIRECTOR PERTAINING TO PLAINTIFF'S FIRST COMPLAINT AGAINST MR. WILSON AND MR. GAVIGAN

224.    On October 11, 2019 Plaintiff appealed the unfair dismissals of his meritorious complaints against Messrs. Gavigan and Wilson (*See* Exhibit 80). In his appeal, Plaintiff lamented:

> Mr. Wilson, Mr. Gavigan, and Ms. Rodelius, as counsels of record, are the ones that have perpetrated a fraud in this matter, and upon the Court,

in their unjust use of the legal system to further a sick and depraved vendetta that has lasted well over a decade, in which I have always been on the receiving end. It is time to put a stop to Wilson's devious behavior and attacks, especially now that he is using the Courts to accomplish his longstanding vendetta…

It is obvious, even looking at the details of the cross examination of Ms. Williams by Mr. Gavigan that he had confidential information pertaining to Ms. Williams immigration history.

> *Q:    For how long did you work for the Defendant?*
> *A:    12 years.*
> *Q:    And that includes your time as a law clerk? A: Yes.*
> *Q:    Okay. Did Mr. Igbanugo assist in any way with you–in your profession other than through your employment?*
> *A:    No.*
> *Q:    Did Mr. Igbanugo in any way help you with any immigration proceedings as part of your own personal circumstances?*
> *A:    I don't understand what you mean.*
> Q:    Did Mr. Igbanugo assist you with obtaining status in the United States?
> A:    You're asking me about my personal immigration status? I did not get my permanent residence through him, if that's what you're asking me.
> Q:    Okay. Was there any employment-based petition for you?
> A:    Yes.
> Q:    And who was the sponsor?
> A:    Igbanugo.
> (Trial Tr., vol. 6, p. 708, November 7, 2017.)

The section above in italics should have been the end of the inquiry with respect to Ms. Williams immigration status, and how she obtained it. The highlighted and italicized portion is crucial evidence that Mr. Gavigan had confidential information. How on Earth would Mr. Gavigan have "deduced" that there was an employment based, non-immigrant petition for her? *And by the way, Mr. Gavigan will easily admit that he does not practice immigration law as the Director concluded in this decision.* So, it is somewhat disquieting that the premise upon which the Director based her conclusion is incorrect ("given that Mr. Gavigan practices immigration law, this connection is more plausible").

> *…The investigator for the OLPR in this matter could have simply inquired of any of the hundreds of experienced immigration lawyers in the Twin Cities as to whether this is the type of information that is publicly available.* But I do not believe that this was done, even though it was at the very fingertips of the OLPR investigator…

225.    On November 19, 2019 the LPRB member assigned the appeal Ms. Jeanette M. Boerner dismissed the appeal stating, "I agree with the Director's determination that there is no clear and convincing violation of the Minnesota Rules of Professional Conduct at this time, and, therefore, discipline is not warranted." (*See* Exhibit 65).

## XVII.    SECOND/NEW COMPLAINT AGAINST: DAVID LEE WILSON, MICHAEL GAVIGAN, AND CASSONDRE BUTEYN

226.    On December 12, 2019 Plaintiff diligently filed his Second/New Complaint Against David Lee Wilson and Michael Gavigan (*See* Exhibit 81). Relevant portions of this second complaint provides:

> I note that in her decision dated November 19, 2019, LPRB Board Member Jeanette Boerner averred that: "*Complainant Igbanugo insists that the malpractice suit, which culminated in a verdict against him, was "frivolous and vexatious." The jury was free to make that assessment and failed to do so having returned a verdict in Respondent's favor…*"
>
> "*However, amenability to sanctions or liability for vexatious and/or oppressive litigation behavior under the bad-faith exception depends not on which party wins the lawsuit, but on how the parties conducted themselves during the litigation…*

227.    By Decision dated December 30, 2019, (*See* Exhibit 74) Ms. Halloran again unfairly dismissed the complaint, finding that discipline is unwarranted.

## XVIII.    APPEAL OF ADVERSE DECISION OF THE OLPR DIRECTOR, PERTAINING TO THE SECOND COMPLAINT AGAINST DAVID LEE WILSON

228.    Plaintiff persevered and timely appealed Ms. Halloran's denial of his second complaint on January 15, 2020 (*See* Exhibit 83), averring that:

I respectfully disagree with the above interpretation of my meritorious complaint against David Wilson for theft and dishonesty. *It is pure fact, not a mere allegation, that Wilson stole a Blackwell Igbanugo (BI) check and deposited it into his personal account without a paper trail, regardless of his subsequent cover-up…*

… I respectfully aver that to call what Wilson did *"an issue of law and fact more appropriately resolved by the district court"* (emphasis added) is simply disingenuous. While I cannot compel the OLPR to do the right thing and investigate Wilson, I believe that the outright refusal to do so is both unjust and immoral.

*I, again, respectfully request that the OLPR thoroughly reinvestigate Michael Gavigan, Eva Rodelius, David Lee Wilson and his co-conspirator/wife Cassondre Buteyn.* The second paragraph of the United States Declaration of Independence starts with the venerable words: *"We hold these truths to be self-evident, that all men are created equal…,"* and these are not just words that ring hollow. *All I pray for is the same fundamental fairness, evenhandedness, and due process of law guaranteed to all by the venerable constitution of this great United States of America, nothing more and nothing less.*

229.    The LPRB again gave this appeal short shrift and dismissed it on February 14, 2020 (*See* Exhibit 71). Amongst other disturbing conclusions, LPRB member Mr. Tommy A. Krause said, "… I agree with the Director's decision not to investigate relative to the $500.00 that Respondent allegedly deposited into his own bank account. This is a matter for a court to determine – not the Office of Lawyer's Professional Responsibility." This finding is flat-out wrong.

230.    Mr. Wilson's conduct in this regard was profoundly unethical. Had it been Plaintiff – God forbid - that had engaged in this type of sordid conduct, Ms. Halloran's response would have certainly approached the level of a "thermonuclear reaction." This is racial privilege and tacit complicity in play, pure and simple.

**XIX.    OLPR DIRECTOR'S INITIATION OF INVESTIGATION WITHOUT A COMPLAINT AGAINS PLAINTIFF'S JUNIOR PARTNER JASON A. NIELSON, ESQ.**

231.     To add insult to injury, Assistant Director Amy M. Halloran initiated a baseless

investigation against Plaintiff's junior partner Jason A. Nielson, Esq. by "Notice of

Investigation" dated March 16, 2020 (*See* Exhibit 88). The notice states in relevant part:

> Pursuant to Rule 25, RLPR, and Rule 8.1(b), Minnesota Rules of
> Professional Conduct, please respond to the complaint stating what
> your role and responsibilities were in the representation of Alejandra
> Catano-Galvan, Maria Delgado, and Olimpia Onofre-Cedillo. *Please
> specify what actions you took in the course of your representation of
> these clients under the supervision of Herbert Igbanugo ...*

232.     By letter dated May 26, 2020 (*See* Exhibit 89) Mr. Nielson responded

with understandable bewilderment, indicating:

> *I am really at a loss as to why I am now being investigated almost two
> years after a complaint was filed by Mr. Michael David Gavigan, Esq.
> specifically against Mr. Herbert A. Igbanugo, Esq. wherein my name
> was unmentioned and absent from the entire 13 page complaint.* While
> I seconded Mr. Igbanugo in the Onofre litigation until we were both
> disqualified, Mr. Gavigan never found fault with me or my conduct in
> any way, manner, or form. Otherwise, he would have filed a complaint
> against me separately.

233.     This investigation of Mr. Nielson initiated without any complaint continues to this

day, inflicting upon Plaintiff additional wastage of firm resources to defend. Mr.

Nielson is simply guilty by his association with Plaintiff.

## XX.     OPEN AND CONTINUING ABUSIVE INVESTIGATION AGAINST PLAINTIFF BY OLPR ASSISTANT DIRECTORS AMY M. HALLORAN AND HER SUPERVISOR JENNIFER BOVITZ

234.     In Plaintiffs' responsive letter dated January 10, 2020 (*See* Exhibit 82), responding

to Ms. Halloran's request for additional information and answers to questions, Plaintiff

wrote:

> Anyway, on December 13, 2019 you responded to my letter of
> December 11 and in relevant parts you indicate that: *"... The Director
> intends to continue with her investigation of this matter ... While I
> appreciate your desire, my investigation thus far has produced facts*

*supporting misconduct warranting public discipline. At this time, I intend to recommend to the Director that charges of unprofessional conduct should be filed regarding the above matters …*

*… I perceive you glibly threatening (and it may well be unintended) my livelihood, my family's livelihood, the livelihood of my extended family in Africa who depend on me, and the livelihood of my staff who also depend on my licensure and good name to make a living.*

*So I want to be very clear that I am not measuring anything with you, Ms. Halloran, or the OLPR Director as you are backed by the might and powers of the Minnesota Supreme Court …* I do not disrespect the OLPR or it's Director; instead, *I harbor the highest respect for this essential self-policing institution for lawyers by lawyers.*

I RESPECTFULLY SUBMIT THAT THE RELUCTANCE OF THE OLPR DIRECTOR TO CONDUCT A MEANINGFUL INVESTIGATION OF WILSON, GAVIGAN, BUTEYN, AND RODELIUS *IS A DEPRIVATION OF DUE PROCESS THAT HAMSTRINGS MY ABILITY TO ADEQUATELY DEFEND MYSELF IN THESE PROCEEDINGS.*

*… Unless and until Wilson and his cohorts are equally/appropriately investigated, I would have been denied or deprived of due process of law and substantially hampered in presenting my defenses in these matters.* All I pray for is the same fundamental fairness, evenhandedness, and due process of law guaranteed to all by the venerable constitution of this great United States of America, nothing more and nothing less.

235.   In further correspondence dated January 27, 2020 (*See* Exhibit 85), responding to

Ms. Halloran's request letter of January 17, 2020, Plaintiff in relevant part stated:

I also noted in my letter of January 10, 2020 that I have cooperated with OLPR in this matter to the highest extent I am able to and *have provided all documents and information reasonably or even remotely calculated to lead to evidence relevant to these matters.*

I guess the above comments and/or responses elicited your statement in sharp language at the end of your letter of January 17, 2020 that:

> *… If you do not provide the requested the bank records, the Director will proceed with an investigatory subpoena.*

> … I have a constitutionally bestowed and protected right to liberty and privacy (confidentiality), like every other citizen of the United States. I am also afforded additional protections from violation of my Civil Rights under 42 U.S.C. § 1983 and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. (Title VII").

236.    In another correspondence dated January 31, 2020 (*See* Exhibit 86), following an in office meeting on January 30, 2020 with Ms. Amy M. Halloran and her supervisor Senior Assistant Director Jennifer Bovitz, Plaintiff pleaded with Ms. Halloran to be fair and investigate Mr. Wilson et. al., stating:

> *I again entreat you, Ms. Halloran, and the OLPR director to investigate Mr. Wilson and his cohorts for a variety of unethical conduct,* including theft of firm funds, disclosure of confidential information, conflict of interest, and vexatious litigation so that I am not further adversely impacted in defending myself in these proceedings. *Otherwise, I will have no choice but to pray to the federal courts for injunctive/declaratory relief.*
>
> *… your continuing investigation of me alone in this matter is tantamount to selective prosecution, which violates my constitutionally guaranteed due process and equal protection rights.*

237.    And in another February 17, 2020 correspondence (*See* Exhibit 87) to Ms. Halloran and Ms. Bovitz, Plaintiff lamented that:

> … This lawsuit, as well as the complaint to OLPR in the aftermath are all mean spirited and based on David Wilson's ill will towards me and my firm. As the District Court judge noted in his Order on Motions in Limine, "*there is, apparently, history of ill will between the two law firm involved in this action.*" However, that history has always been one sided on David Wilson's part, as the entire record will show (***See* Exhibit M).**

238.    All of Ms. Halloran's reasoning for declining to investigate and/or find any faults or ethics violations by Mr. Wilson and his associates boil down to a mere "***because I said so***," explanation, which has been found by the Eighth Circuit Court of Appeals to be vulnerable to serious criticism. *Sugule v. Frazier*, 639 F.3d 406, 412 (8th Cir. 2011).

### XXI.   MS. HALLORAN'S FILING OF "CHARGES OF UNPROFESSIONAL CONDUCT, NOTICE OF PANEL PROCEDURES, AND NOTICE OF PANEL ASSIGNMENT" DATED DECEMBER 31, 2020

239.   Upon return to work from the Christmas and New Year's holidays on Monday January 4, 2021, both Plaintiff and Mr. Nielson received Ms. Halloran's "Charges of Unprofessional Conduct, Notice of Panel Procedures, and Notice of Panel Assignment" dated December 31, 2020. It appears that even the timing of the filing was deliberately designed by Ms. Halloran to inflict the maximum amount of harassment possible upon Plaintiff in the very beginning of a new year wherein Plaintiff already has his hands full with pursuing several pressing COVID-19 related court-modernization, judicial training, health care and energy projects for U.S. governmental agencies in Sub-Saharan Africa (*See* Exhibit 93).

240.   Plaintiff planned to "hit the ground running" this New Year, but now has to set aside an additional substantial amount of his time in responding to Ms. Halloran's charges, which is definitely a huge distraction. The document numbering over 54 pages, and with attachments is aptly described as a false narrative, and parrots Mr. Wilson's wickedly false allegations contained in his post-*Onofre* ethics complaint.

241.   In addition to the *Onofre* matter, Ms. Halloran brings up three other client fee refund complaints that she has been investigating for the past 1-2 years. Common to all the fee refund matters raised, is the dishonest contention that Plaintiff charged the clients "Availability Retainer Fees" in a manner that violates the ethics rules.

242.   The allegations contained in this document have all been debunked by Plaintiff in his responses to Ms. Halloran's inquiries over the past 1-2 years. But, in preparing the charges, Ms. Halloran unfairly disregards all of the plausible explanations provided by

Plaintiff, and accepts as gospel truth the dishonest allegations of Mr. Wilson et. al. as well as her own speculation and conclusions as to what transpired with the clients.

243.    For instance, by responsive letter dated January 31, 2020, Plaintiff, rebutting the allegation of charging "Availability Retainer Fees" explained,

>  However, in previous correspondence and during the meeting yesterday, I again explained that I do not and have never categorized any portion of my legal fee as a non-refundable availability retainer fee. *That section of the old fee agreement, which has since been revised, was used for the down payment portion of the flat fee agreement. Again, the availability retainer fee verbiage is mere surplusage from a cookie-cutter fee agreement we used for many years.* You provided me with copies of related fee agreements in regards to the above referenced cases, stressing that there were dollar amounts under the availability retainer fee verbiage in the contracts.
>
> *However, in each fee agreement you can clearly see that when the amount – which you insist is an "availability retainer fee" but which is actually the down payment - is added to the amount of the payment plan/balance owed, it always equals the amount of the total flat fee charged. This is 100% proof positive that we have not unethically charged availability retainer fees to any clients. No payments above and beyond the flat fee were ever charged to obtain my services. Stated succinctly, no fees have ever been paid to us in connection with a contract for legal services that are separate from and in addition to the total flat fee.* Therefore, you are clearly incorrect in your claim that I charged availability retainer fees that violates the ethics rules.
>
> I also note that depending on which staff member prepared a particular fee agreement, sometimes there is a number under the "availability retainer fee" verbiage, and sometimes there is not. In addition, sometimes there is a number under the "availability retainer fee" and a number under the "flat fee" and they always add up to the total fee payable. There are many variations, but they all result in the clients owing a flat fee amount. *In sum, I charge my clients a flat fee, request a down payment, and provide a monthly payment plan.*
>
> All the fee agreements state, "THE FLAT FEE...IS SUBJECT TO A PARTIAL OR FULL REFUND ONLY IF IGBANUGO PARTNERS DOES NOT PROVIDE THE AGREED-UPON LEGAL SERVICES." The fee agreements inform Plaintiffs that the fees will not be held in a trust account. *Therefore, to maintain that I have charged availability retainer fees is disingenuous and oppressive.*

244.     Another theme that is popular in Ms. Halloran's charges of unprofessional conduct are those of competency and diligence. Without a good understanding of U.S. immigration laws, she surmises to a false conclusion that Plaintiff and Mr. Nielson did not handle client's cases competently and diligently, which evidences Plaintiff's contention that in any encounter with OLPR – in this instance Ms. Halloran - there tends to be some type of overreach.

245.     But, compare her allegations in the statement of charges with the ***case of the little blind Mexican boy***, ***Ulises Linares Morales*** (whose case quickly comes to mind) whom both Wilson et. al. and Plaintiff represented in an immigration matter. (*See* Exhibit 96). Actually, Plaintiff cleaned up Mr. Wilson et. al.'s mess up. Mr. Wilson and Ms. Buteyn clearly committed irrefutable ineffective assistance of counsel in the matter and suffered no investigation, let alone consequences.

### a.   Case of Ulises Linares Morales

246.     In that case, Mr. Wilson and Ms. Buteyn were retained to obtain lawful permanent resident status for the minor, who is almost completely blind. He was the beneficiary of an approved visa petition, but he was ineligible to adjust status. Instead of pursuing DACA, Mr. Wilson and Ms. Buteyn sent him to the "hell hole" country of Mexico to consular process in July of 2011, which was truly ill advised.

247.     Sending him to Mexico compromised his eligibility for DACA, and to make matters worse, he got stranded in Mexico for 18 months because the U.S. Consulate declined to issue him an immigrant visa. He became severely depressed, suffered from suicidal ideation and sustained more damage to his eyes. He desperately wanted to return to the United States, and was told by Mr. Wilson and Ms. Buteyn that they could not do

anything to bring him back to the United States while the immigrant visa denial was being appealed, which could take several years.

248.    Mr. Wilson and Ms. Buteyn advised that he should consult a Canadian immigration lawyer who was a friend of Ms. Buteyn who charged the family an additional $2,000.00 in a misguided and failed attempt to get him into Canada. They stopped returning his and his family's telephone calls after some time, and actually sued the ailing family for unpaid attorney's fees in the matter.

249.    Luckily, the family came to Plaintiff's firm for a second opinion. The family hired Plaintiff in November 2012, and Plaintiff brought him back to the United States in March of 2013 on *humanitarian parole*. This is a well-known relief and process that Mr. Wilson and Ms. Buteyn should have known about and pursued if they were as competent and diligent as they claim to be.

250.    The family filed an ethics complaint against Mr. Wilson, and the OLPR declined (in a clear double standard compared to this instance) to investigate and said:

> Your complaint alleges attorney negligence, poor-quality representation or malpractice. *The Director's Office generally defers consideration of these types of allegations to the civil courts. This policy recognizes that not all acts constituting negligence, poor quality representation or even legal malpractice necessarily involve conduct that violates the Rules of Professional Conduct.*

251.    And regarding Mr. Wilson's collections lawsuit, the OLPR opined:

> …Regardless, whether Mr. Wilson and his law firm are/were entitled to payment for their services is/was an issue more appropriately addressed by the court before which the matter will be/was heard.

252.    Mr. Linares Morales appealed the adverse decision to the LPRB and in a decision dated July 14, 2014 (*See* Exhibit 96) the assigned Board Member Mr. Kenneth S. Engel opined as follows:

… I find that – despite the fact that there have been allegations raised by Mr. Linares Morales of professional misconduct by Mr. Wilson, including but not limited to *allegations that Mr. Wilson generally provided improper advice regarding Mr. Linares Morales' immigration-related matters, that Mr. Wilson failed to inform Mr. Linares Morales that Mr. Linares Morales qualified for humanitarian parole, that Mr. Wilson acted in an insensitive manner when advising Mr. Linares Morales, that Mr. Wilson provided Mr. Linares Morales with contact information for a Canadian attorney who provide Mr. Linares Morales with no tangible results, that Mr. Wilson was complicit in providing Mr. Linares Morales with improper advice as to whether Mr. Linares Morales parents could speak with Mr. Wilson and Mr. Wilson's law firm about Mr. Linares Morales' matters, and that Mr. Wilson filed a collection lawsuit against Mr. Linares Morales despite Mr. Linares Morales' assertion that Mr. Wilson handled Mr. Linares Morales' matters incompetently*, I find that the Complaint and the other information provided by or on behalf of Mr. Linares Morales *do not state a basis for a reasonable belief that misconduct by Mr. Wilson may have occurred.* I therefore approve the Director's disposition of this matter by the Director's determination that discipline of Mr. Wilson is not warranted…

### b.  The Case of the Reverend Nelli M. Vahter

253.    Another ineffective assistance of counsel ethics matter involving Mr. David Lee Wilson and his former partner Julie Zimmer in 2006 pertained to Reverend Nelli M. Vahter and her husband Mr. Edward Pulst. This is another instance in which harmed clients came to Plaintiff for a second opinion and hired him to help revive their special religious minister nonimmigrant visa R-1 case and their form I-360/Form I-485 special immigrant minister visa petition/adjustment applications, which Mr. Wilson and Ms. Zimmer completely bungled. (*See* Exhibit 97).

254.    Exhibit 97 contains Plaintiff's amicable letter dated May 3, 2012 addressed to Ms. Julie Zimmer and Mr. David Wilson, entitled "Request for Assistance with Reviving Previously Denied Form I-129 Petition for Nonimmigrant Worker (R-1 Status)". The document speaks for itself with respect to Plaintiff's good faith efforts to resuscitate the

immigration matter without having to file a *Lozada* action because admission of mistake by Wilson Zimmer would have worked better to salvage the client's predicament.

255.     However, when Mr. Wilson and Ms. Zimmer declined to cooperate with Plaintiff, the client decided to file a *Lozada* complaint against Julie Zimmer alone because she handled the case for Wilson Zimmer.

256.     Due to the disorganization of Mr. Wilson and Ms. Zimmer at the time they were disengaging their practices, Mr. Wilson failed to timely send Rev. Vahter's file to Ms. Zimmer, who in turn sent a notification to the client at a wrong address, resulting in delays and culminating in Mr. Wilson, Ms. Zimmer and the client missing a deadline to extend her R-1 nonimmigrant status during the pendency of her form I-360 special religious minister immigrant visa petition.

257.     As a result, Rev. Vahter and her husband fell out of status, which also rendered them ineligible to adjust status after the approval of her Form I-360. Rev. Vahter essentially complained that Ms. Zimmer failed to provide her with proper advice and timely remind her that she needed to file an extension of her R-1 status prior to its expiration on October 15, 2006. And worse yet, Ms. Zimmer was unaware and failed to inform her about a temporary USCIS policy based on federal court litigation (*Ruiz-Diaz v. United States,* 618 F.3d 1055 (9th Cir. 2010)) that opened up a window of opportunity from June 2009 - November 2010 for her and her husband to adjust status, even though they failed to maintain R-1 status.

258.     In unfairly absolving Ms. Zimmer of any and all liability, the OLPR Assistant Director acknowledged that:

Complainant alleges that the duty was on respondent to timely file any extension request; since respondent had been engaged to file an I-485, adjustment of status application, and that the application would be futile without an extended R-1 status, respondent had the duty to ensure that the R-1 status remained current.

As a client courtesy, respondent should have notified complainant and the employer of the need to file for extension of status. Probably, the respondent's computer system would have reminder her of the expiring R-1 status but for the disbanding of the firm.

This was a close call: There is no evidence the employer/complainant was notified of the impending need to file for extension of status …

259.    Having said the above, OLPR determined that discipline was not warranted. Rev. Vahter appealed and the LPRB affirmed, both blaming the victim, Rev. Vahter, for not taking the bad advice of Ms. Zimmer to depart the country to consular process and take the very high risk not being able to return.

260.    Rev. Vahter had correctly lamented in her appeal of the OLPR adverse decision on her complaint to LPRB (*See* Exhibit 97):

No matter how the determination wants to justify or excuse her, it is Ms. Zimmer's failure to properly and timely advise me to file for an R-1 extension, prior to its expiration, that led to my losing lawful non-immigrant status in the United States and eligibility to apply for a green card based on the approved I-130 petition. She also did not inform me about the policy that USCIS issued in June 2009, which allowed me to file for an adjustment of status up until November 9, 2010, and be excused for my unlawful presence or falling out of R-1 status for more than 180 days.

Finally, I disagree with the conclusion that: "Ruiz Diaz was not a decision that most immigration attorneys readily know except for those who have significant religious worker practice. Respondent did not do much religious worker matters, and acknowledged that she was unaware of that decision and how it would have impacted complainant". If she doesn't understand religious worker cases, why did she take our case. Isn't it all immigration law?

261.    Sadly, USCIS would have granted relief had OLPR found ineffective assistance of

counsel, which was the appropriate thing to do, because in its adverse decision dated

October 31, 2014, USCIS opined (*See* Exhibit 97):

> In your response you also continued to assert that your failure to
> maintain a lawful status was through no fault of your own but rather
> the fault of your previous attorney, Julie Zimmer. The record shows
> that Ms. Zimmer vigorously disputes your contention. It shows that
> pursuant to your complaint the Director of the Office of Lawyers
> Professional Responsibility determined that discipline of Ms.
> Zimmer is not warranted.
>
> … but your contention that your failure to maintain a lawful status
> was through no fault of your own is unsupported by the record. More
> accurately, it appears to be the result of a failure shared by you, Ms.
> Zimmer, and possibly your employer. Consequently, your
> application must also be denied on the grounds of your failure to
> maintain legal status.

262.    OLPR/LPRB obviously afforded Ms. Zimmer racial privilege as they did to Mr.

Wilson & Ms. Buteyn in the case of Mr. Morales. Plaintiff has never been judged by

this type of lenient standard by OLPR/LPRB.

263.    Plaintiff plans to request that OLPR/LPRB in all fairness defer panel proceedings

until this Honorable Court resolves this Civil Rights lawsuit as a resolution of this

matter will resolve the Constitutional issues that will ensure that said panel proceedings

will comply with due process of law.

264.    If the request is declined, then Plaintiff will be compelled to file with this Court a

motion for preliminary injunction, together with a request for a Temporary Restraining

Order (TRO). But it is not Plaintiff's desire to disturb this Honorable Federal District

Court until and unless he has tried to resolve deferral of the panel proceedings amicably.

## XXII.    THE RACIAL ANIMUS OF THE OLPR (MS. HALLORAN) IN THIS ONGOING OPPRESIVE ETHICS INVESTIGATION

265.  It is said that this past overall bad year, 2020 was America's year of reckoning with racism and the ravages of racism in her body politic. Racial injustice in today's United States of America is simply an unfortunate remnant of the toxic legacy of slavery. Race is unique in this country's constitutional history, and eradicating racial discrimination presents a particularly unique and compelling interest. The quote directly below underscores this salient point:

> Our popular history of the (civil rights) movement largely sidesteps how and by whom racial inequality was perpetrated and maintained. Without understanding how and why a system of racial injustice was propelled *not only by people who were yelling but by people who were silent,* not just by violence but by state bureaucracy, and by refusing to grapple with the various interests and benefits this system accrued for many and the fears people harbored of standing up against it, we miss a key lesson from this history. – Jeanne Theoharis ("A More Beautiful and Terrible History").

266.  Plaintiff respectfully submits that he has been treated poorly or less well by the Minnesota OLPR/LPRB in the *Onofre* related ethics cross complaints at least in part because of his protected characteristics.

267.  In fact, it is out of an incorrigible habit of candor and an abundance of caution that he avers that unlawful discrimination is one of the motivating factors, even if it was not the sole motivating factor for his unequal treatment by the Minnesota OLPR/LPRB. The totality of facts and sequence of events outlined in this complaint certainly give rise to an inference of discriminatory animus.

### a.  The Genesis of OLPR's Ill Will Towards Plaintiff

268.  Around 2007, Plaintiff had a regrettable encounter with then OLPR assistant director Mr. Patrick Burns, and his then-assistant, Ms. Cassie Hanson. The matter arose because Plaintiff's firm's accounting administrator at the time mistakenly wrote two

corporate client H-1B Visa Petition filing fee checks out of the trust account when said checks should have been written out of the general account because the firm fronted filings fees for this particular corporate client.

269.    Plaintiff signed the checks mistakenly believing that they were properly issued out of the trust account. These checks overdrew the trust account, causing the bank to report the overdraft to the OLPR, as they are required to do.

270.    The mishap occurred shortly after Plaintiff's infant son (Adan Chinedu Igbanugo) passed away in 2007 after being hospitalized for six-months and Plaintiff was distraught and distracted. Mr. Burns assisted by Ms. Hanson, found that the books were not being properly maintained and demanded during a meeting at OLPR premises in St. Paul that Plaintiff agree to a public reprimand for *misappropriation of client funds.* Plaintiff regrettably went ballistic and walked out of the meeting.

271.    Quite frankly, Plaintiff really lost it and said many things that he should have never said. Plaintiff very much regrets what transpired and how he handled it, and wishes he could wipe the slate clean, but it is simply impossible to do so. With OLPR, Plaintiff lost control because he was distraught during that time period that he was grieving the death of his first son. Plaintiff still deeply regrets that most unfortunate encounter.

272.    However, on that very day, Plaintiff certainly became – to the OLPR - the stereotypical "angry black man" and a "marked man" to boot, because the OLPR has never forgotten the incident. Plaintiff truly believes this to be true, because he has felt and experienced an unusual level of animosity in any routine encounter with the OLPR since that very day.

273.    Simply said, Plaintiff has continued to be punished for daring to "talk back" out of an instinct of self-preservation and in self-defense from an unfounded, ugly accusation of misappropriation of client funds. Plaintiff reiterates that it was not at all helpful that this occurred during a period of family bereavement and related sorrow.

274.    As previously stated, Plaintiff had another encounter with the OLPR when on October 18, 2013 the Minnesota OLPR issued a petition for disciplinary action against Plaintiff in connection with six separate matters, some of which dated back six or seven years prior to the charges.

275.    Plaintiff responded to a Minnesota Star Tribune inquiry, which published an article, *"Twin Cities Immigration Lawyer Facing Possible Disciplinary Action,"* and led with the caption, "*He claims racism is behind "unholy and unjust" allegations."* (https://www.startribune.com/twin-cities-immigration-lawyer-accused-of-misconduct/237205341/) And the introduction read:

> *A prominent Twin Cities immigration lawyer is in trouble with a state professional responsibility board* that alleges he engaged in unethical conduct dating back nearly a decade.

> *He claimed "a legitimate system" has been unfairly applied to him because he is black and African*, but didn't offer further explanation. *"This is as personal as it is unholy and unjust, and cries to the heavens for redress,"* he wrote. *"The allegations are false, mean-spirited and deliberately stated out of context with evil intent and to inflict the highest damage to my reputation for reasons I know quite well.*

276.    In a related article entitled, "The Matter of Herbert Igbanugo and the Minnesota Supreme Court," published by *Mshale* (https://mshale.com/2015/10/19/matter-herbert-igbanugo-minnesota-supreme-court/)*,* the preeminent African Community Newspaper in Minnesota, with tentacles all over the United Sates, the author observed and wrote in relevant part:

The news of the suspension of longtime Twin Cities attorney Herbert Igbanugo hit the community like a thunderbolt this past May. *The Minnesota Supreme Court suspended the high profile Mr. Igbanugo for three months…*

A little background might be in order for the few, at least in Minnesota, that might be unaware of what Mr. Igbanugo represents in the African community… *Within our community, it is an established fact that Mr. Igbanugo is on the top tier of lawyers in the state.* For a number of years, he was one of the main partners at Blackwell Igbanugo Partners, the largest black operated law firm in the United States. That is worth repeating so it does not escape anyone. The largest black operated law firm in the country when the firm was in existence…

Given his position in our large community, Mr. Igbanugo's recent experience has touched many and caused consternation and heartache, with many who are not even his clients wondering what this portends for the community… keeping in mind that some of the most controversial cases in the African immigrant community context, and some might argue even beyond the community, have been taken on by Mr. Igbanugo. *All communities need blue chip type players in all key professions. As far as lawyers are concerned, Mr. Igbanugo is one of those blue chip players in that profession from our community.*

Even while they were suspending Mr. Igbanugo for misconduct, you need to be aware what the Referee (who is the person tasked with the investigations and recommendations to the Supreme Court) said in his report to the court to help our high court to come up with its decision:
1.) *Respondent (Igbanugo) did not commit any professional misconduct involving dishonesty, fraud, deceit or misrepresentation*
2.) *Respondent did not make false statements to the court either overtly or by omission in his collections lawsuit*
3.) Legal representation continued for all clients even if legal fees were in arrears
Additionally, the referee found that the respondent (Herbert) did not charge "unreasonable fees".

… He is free to practice law again per the Minnesota Supreme Court and this quote from the Referee that brought the charges against him is all we have to say and let you make your own conclusion (these are not our words but words written by the person that recommended Mr. Igbanugo be suspended): *"Respondent is a supremely confident, assured and competent individual who has strong religious beliefs and high expectations for himself and others."*

277.    Ethics lawyers who are former employees or assistant directors or directors of the

OLPR will tell you that the OLPR harbors a "deep bench" style institutional memory –

which is long and unforgiving - with respect to any lawyers that they believe crossed

them, so to speak.

   **b.   Historical Misuse of the Bar Disciplinary System Against Racial Minorities**

278.    In an article by James E. Moliterno, "Politically Motivated Bar Discipline," 83,

Wash. U. L. Q. (2005)

(https://openscholarship.wustl.edu/cgi/viewcontent.cgi?article=1242&context=law_la

wreview), the author addressed the deep and dark issue of unconscious bias, systemic

racism, and racial privilege in the context of bar discipline dating back to a century or

so. In relevant parts, the author observed poignantly as follows:

> But despite the neutral-sounding reasons, and despite sometimes good
> or benign intentions, *political use of the bar machinery has been about
> exclusion, repression, and retribution.*
>
> … *Commonly, politically motivated bar actions lack merit.* Some
> politically motivated bar complaints or bar actions may have technical
> merit, at least at the time of their initiation … *In the absence of merit,
> if a bar complaint bears other marks of political action (other interests
> of the complaining party, context of the complaint), a political motive
> for the action is highly likely.*
>
> At critical periods in the nation's 20th Century history, bar machinery
> has been used as a tool of repression and preservation of homogeneous
> thought …
>
> … In some of these historical instances of political use of the bar
> admission and disciplinary machinery, *the bar itself was both the
> instigator and the decision-maker…*
>
> … Harassment of southern lawyers who represented civil rights
> workers was fierce. Very few white southern lawyers were willing to
> represent civil rights workers in the deep south. Among the few who
> did, one was disbarred in Mississippi. A black lawyer representing
> school desegregation plaintiffs in Mississippi was harassed by a federal
> district judge regarding his professionalism, threatened with findings

of professional misconduct, and interrogated for a length of time that filled 118 pages of transcript. *The harassment continued until the court of appeals said that the district judge was creating "humiliation, anxiety, and possible intimidation of . . . a reputable member of the bar."* The claims against the lawyer were entirely baseless. "All of the testimony in this matter . . . completely exonerates Brown from any improper conduct.

*The American legal profession, the organized bar in particular, has a dreadful history of political misuse of bar discipline and admission in the name of character evaluation and ethical principles.*

279.    Other recent studies have found racial disparity in attorney discipline. The *Sacramento Bee*, in a November 15, 2019 article written by Andrew Sheeler, headlined that, "California's Black Attorneys are 3 Times More Likely to be Disciplined than White Lawyers," (https://www.sacbee.com/news/politics-government/capitol-alert/article237399369.html#:~:text=Capitol%20Alert-,California's%20black%20attorneys%20are%203%20times%20more,be%20disciplined%20than%20white%20lawyers&text=Black%20male%20attorneys%20are%20more,the%20State%20Bar%20of%20California.) stating:

Black male attorneys were more likely to be sanctioned by the State Bar in part because they were disproportionately more likely to be the subject of a complaint to the bar, the study found.

However, even adjusting for that, the report found that black male attorneys were still more likely to be put on probation or disbarred.

280.    In another article citing the same subject matter dated November 18, 2019 and written by Debra Cassens Weiss of the *ABA Journal* entitled, "New California Bar Study Finds Racial Disparities in Lawyer Discipline," (https://www.abajournal.com/news/article/california-bar-study-finds-racial-disparities-in-lawyer-discipline) the author detailed that:

The study found racial disparities in probationary discipline, disbarment and discipline-related resignation, ***with the greatest***

84

> *disparities between black and white male lawyers, according to a Nov. 14 press release…*
>
> The study reviewed probations, disbarments and discipline-related resignations of more than 116,000 attorneys admitted between 1990 and 2009. Discipline outcomes were analyzed for this group from 1990 to 2018. The study found that male lawyers have higher rates of probation, disbarment and resignation than female lawyers, ***and the largest racial differences were between black male and white male lawyers.***

281.   In an *Above the Law* article entitled, "Study Finds that Bar Discipline is Totally Racist Shocking Absolutely No One," by Joe Patrice (https://abovethelaw.com/2019/11/study-finds-that-bar-discipline-is-totally-racist-shocking-absolutely-no-one/), dated November 19, 2019, he states that:

> A California bar study has charted attorney discipline over a 28-year span and discovered that, by and large, *black and Latinx attorneys are disciplined more often and their punishments are more severe than the comparable population of white lawyers.* This is, of course, not a huge surprise and confirms similar studies from a variety of other settings. Still, if one were holding out hope that the legal profession were somehow better, then we've got some bad news for you…

282.   In the last article citing to the California State Bar Study, dated June 29, 2020 and written by Caroline Spiezo of *Thompson Reuters*, entitled, "Racial Bias in Attorney Discipline? Few States Track for it," (https://www.reuters.com/article/lawyer-bar-race-and-discipline/racial-bias-in-attorney-discipline-few-states-track-for-it-idUSL1N2E60D2) she writes:

> But in the wake of California's report, and amid a sharper focus on racial injustice following the death of George Floyd, a black man in Minneapolis last month, after a white police officer kneeled on his neck, some Bar leaders say the issue warrants a closer examination. "It's a problem everywhere else," said Mirna Santiago, Chair of the New York State Bar Association's Diversity Committee. "Black boys tend to be more overly disciplined in middle and elementary, and even high school, Black men with police officers, they get shot at a

disproportionate rate. I wouldn't be surprised to see it in attorney discipline. But I don't have any statistics.

*California's statistics showed black men admitted to the state's Bar were nearly four times more likely to be disbarred than white men.* Black women were more than twice as likely to be disbarred as white women …

*Reasons for Black attorney's higher disbarment rates include a lack of diversity on Bar discipline committees and subjective discipline processes,*" said David Wilkins, a Harvard law School professor who studies legal ethics and race in the legal profession.

### c. Implicit, Explicit, and Structural Racial Biases in America's Institutions, Including OLPR/LPRB

283.    The U.S. society, including its legal system is said to be rigged and/or replete with implicit, explicit and structural biases against minority groups. The existence of implicit bias in the legal profession is well documented. It is said that conscious and unconscious biases are baked into the system. Perhaps, this is the part of implicit bias that is so insidious and difficult to change – the favoritism for Mr. Wilson against Plaintiff in this matter based on race.

284.    Even in Plaintiffs' 32 year career as a lawyer, he has seen much injustice that has been written off as the errors of bad apples when it seems crystal clear that the rot is deeply ingrained at the structural and systemic level, and indeed throughout the roots and branches, as well as the fruits, so to speak.

285.    In the context of the cross complaints filed by both sides in the aftermath of the *Onofre* litigation, Ms. Halloran engaged and continues its indulgence in prosecutorial discrimination that egregiously violates Plaintiffs' civil rights, including their serial minimization and immunization of Mr. Wilson's varied unethical conduct both in the *Onofre* case and outside the *Onofre* matter.

86

286.    Ms. Halloran's purported investigation of Mr. Wilson, his firm, and associates was a charade with a pre-determined outcome in their favor. She abdicated her duty to be evenhanded and abused her power in making the decision not to lift a finger to investigate Mr. Wilson and his firm for their unethical tactics in the *Onofre* litigation and relentless vindictiveness – including violation of numerous ethics rules - in Mr. Wilson's documented quest for a vendetta against Plaintiff.

287.    In an article published June 24, 2020 titled, "Guest Chair Column: Dying to Belong: Racism as a Public Health Issue," (by Montrece M. Ransom, JD, MPH Vice Chair, Coordinating Committee on Diversity) (https://www.americanbar.org/groups/health_law/publications/health_lawyer_home/2020-june/chair/) the author noted that:

> …Studies show that the racism and discrimination that we Black Americans experience in our daily lives create stress that affect our internal organs and overall physical health…
>
> …As Christine Vestal notes in her article on the topic, *"being black is bad for your health. And pervasive racism is the cause…"*
>
> … They are the result of deep-seated systemic racism that exists across all segments of our society—from our courthouses, to our hospitals, to our schools, to our workplaces…
>
> …Action is needed to reverse hundreds of years of racism that is built into the core of our country.

288.    The Twin Cities of Minneapolis & St. Paul has unfortunately been the epicenter of the year 2020's national outrage on systemic racism that some argue pervades not only law enforcement organizations and the court system, but also businesses across all industries and sectors of this society.  In an article by Paul Nolan dated December 9, 2020 in Minnesota Lawyer, entitled, "Diversity Panel Sees Much Room for

Improvement," (https://minnlawyer.com/2020/12/09/diversity-panel-sees-much-room-for-improvement/#:~:text=In%20a%20recent%20virtual%20presentation,to%20assemble%20more%20diverse%20teams.) he states:

> It has always struck me as ironic that the legal profession is one of the slowest industries to evolve with respect to diversity, *especially when our industry is charged with upholding the law and ensuring civil rights are not violated,"* said Anna Richo, corporate senior vice president, and general counsel at Minnetonka-based Cargill.

> "Progress comes in fits and starts, and justice arrives too slowly," Davis added. *"The history of lawyers of color in Minnesota reflects the challenges and triumphs of our communities in color in this state… Let us continue to fight for full representation and true equality in our profession."*

289.    In the aftermath of the death of George Floyd the Minnesota State Bar Association, Hennepin County Bar Association, Ramsey County Bar Association, and the Minnesota Chapter of the Federal Bar Association in its statement on George Floyd (https://www.mnbar.org/ramsey-county-bar-association/news/announcements/2020/06/01/minnesota-state-bar-association-hennepin-county-bar-association-ramsey-county-bar-association-and-minnesota-chapter-of-the-federal-bar-association-statement-on-george-floyd-rcba)    announced that:

> The Minnesota bar associations, and the legal profession itself, are dedicated to the Rule of Law, equal justice for all, and the dignity and sanctity of human life.

> The Bar Associations also recognize that the rule of law needs to protect us all and must exist at all levels of our justice system …The peace and well-being of our community relies on trust in our system of justice...

290.    The Minnesota State House Select Committee on Racial Justice was established by the Minnesota Legislature on July 11, 2020 as part of the House resolution that declared racism a public health crisis in Minnesota (https://www.house.leg.state.mn.us/comm/docs/tElVeP6cVEaYSyh0-o0utQ.pdf).

291.    The enabling resolution focused on collaborating with States' legal and justice agencies and the community to address how best to dismantle systemic racism in Minnesota. The House Select Committee's Report describes many race related terms, including *racial privilege*, which it described as:

> Like two sides of the same coin, racial privilege describes race-based advantages and preferential treatment based on skin color, while racial oppression refers to race-based disadvantages, discrimination, and exploitation based on skin color.

292.    In an article published by *Minnesota Lawyer,* entitled, "Gavel Passes to New President of ABA," (https://www.americanbar.org/news/abanews/aba-news-archives/2020/08/outgoing-aba-president-passes-gavel--new-leadership-outlines-pri/#:~:text=Judy%20Perry%20Martinez%20passed%20the,Video%20Player%20is%20loading.) dated August 10, 2020 it noted:

> Referring to "the twin evils of racism and unconscious bias" that have "prevented Black Americans from full participation in the promise of America," Refo called on lawyers to "own the shortcomings throughout that system that disadvantage Black Americans, that build in barriers Black Americans must overcome that white Americans do not.

293.    In an *ABA Journal* article, "Legal community has a 'special responsibility to fight injustice,' ABA president says in final speech" by Mark Reynolds (https://www.abajournal.com/news/article/aba-president-cites-special-responsibility-to-fight-injustice-in-final-speech#:~:text=Annual%20Meeting-

[,Legal%20community%20has%20a%20'special%20responsibility%20to%20fight%20injustice%2C',president%20says%20in%20final%20speech&text=%E2%80%9CLawyers%20must%20fight%20injustice%20when,Martinez%20said%20in%20prerecorded%20remarks](.), the ABA President Judy Perry Martinez recognized the burden the pandemic has placed on the legal profession while urging a forceful response to racial injustice, noting:

> "Let none of us say the job is too big or the problems of racism run too deep," Martinez said. "This is our torch to carry. Lawyers have a special responsibility to fight injustice, especially injustice caused by laws and practices that are racist and unjust in word or effect."

> "Everyone needs to be at the table to achieve what for too many is a long-overdue breaking of the silence regarding the truth about our legal system and society: *the existence of persistent, overt and implicit racism*," Martinez said.

294.   In a *University of California, Davis Journal* (Vol. 46: 1563) article by Debra Lyn Bassett, entitled, "Deconstruct and Superstruct: Examining Bias Across the Legal System," ([https://lawreview.law.ucdavis.edu/issues/46/5/bias/46-5_Bassett.pdf](https://lawreview.law.ucdavis.edu/issues/46/5/bias/46-5_Bassett.pdf)) she counsels that:

> … *The potential for bias extends to attorneys,* who may favor one client over another, adopt assumptions, or assert peremptory challenges due to biased stereotypes or expectations. *The potential for bias extends to jurors,* who may approach legal proceedings with biases or prejudices that impact their perceptions and their decision making in evaluating the participants in those proceedings. *And the potential for bias extends to judges*, who may be biased in favor of (or against) particular claims, particular litigants, or particular lawyers….

> …  The American Bar Association's Section on Litigation has already initiated a program that hopes to increase the judiciary's self-awareness of unconscious bias, and there have been three pilot judicial education programs addressing unconscious bias in California, *Minnesota*, and North Dakota.

295.    In a *Duke Law Journal* (Vol. 57:345) article entitled, "Forgotten Racial

Equality: Implicit Bias, Decisionmaking, and Misremembering," by Justin

Levinson

(https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=1336&context

=dlj), he notes in the abstract section:

> The presence and power of implicit memory bias in legal decision
> making raises concerns about the legal system's ability to achieve
> social justice… The response with the greatest permanent potential,
> however, requires embracing cultural responsibility for the presence of
> negative racial stereotypes and coordinating efforts for change.

> How can the American legal system stand for justice and fairness when
> it embraces a decision making process that propagates racial bias? …
> When racial stereotypes no longer disproportionately link minorities to
> negative traits, implicit memory biases will disappear.

296.    In a *Florida Law Review* Article from January 2017 (Vol. 69, Issue 1), entitled

"Judging Implicit Bias: A National Empirical Study of judicial Stereotypes" by Justin

D. Levinson, Mark Bennett, and Koichi Hioki, (http://www.floridalawreview.com/wp-

content/uploads/Levinson_Bennett_Hioki.pdf) they write:

> Professor Jeffrey Rachlinski and his colleagues conducted a study of
> 133 state or local trial judges at three different judicial conferences.
> Judges were tested both using an Implicit Association Test (IAT) and
> a separate priming measure.

> The results of the study showed that, on the IAT, judges indeed
> harbored the anti-Black implicit biases that the rest of the population
> has been repeatedly shown to possess—judges more readily associated
> Black with bad and White with good.

297.    In an article published in 2015 by *Court Review*: *the Journal of the American*

*Judges Association* (University of Nebraska – Lincoln) entitled, "Implicit Bias and the

American Juror" by Jennifer Elek (*National Center for State Courts*) and Paula

Hannaford-Agor (*NCSC Center for Jury Studies*),

(https://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1517&context=ajacourtreview) they write:

> … People develop these associations (i.e., attitudes and stereotypes) between particular social groups and particular qualities (for example, one study showed that many participants implicitly associate "black" with "guilty," and other studies have shown associations between African-Americans and negative characteristics such as aggression and hostility) as they learn from their social environment (e.g., media, parental, or peer role models). The influence of these attitudes or stereotypes in producing a discriminatory response may occur involuntarily and without a person's conscious intent…

298.   In an article entitled, "Condemning Systemic Racism" published on Friday May 29th, 2020 by the *Brookings Institute*, the author, John R. Allen, (https://www.brookings.edu/president/condemning-systemic-racism/) horrified by the killing of George Floyd and Ahmaud Arbery in Minnesota and Georgia respectively said:

> … We will call out systemic racism, and we will call out unrepentant racists— and we will continue helping to move the country toward racial equity through our writing, research, and policy suggestions. Our Inclusion & Diversity Committee will follow up soon with opportunities to *provide spaces for expression as well as resources to become better informed on what racism and white privilege are*, and how to work through these challenging times...

299.   On October 22, 2020 *The American Bar Association* (ABA) announced an inaugural event slated for October 29, 2020, spearheaded by the ABA Fund for Justice and Education (FJE) which is the association's charitable 501(c)(3) arm. While FJE raises money for an array of ABA programs, of the eight areas specifically highlighted in the inaugural event the first line item is designated for:

> Race Equity and Justice Fund, which supports ABA programs dedicated to developing training resources and policy that work to advance diversity, equity, inclusion and anti-racism in the legal profession and justice system.

> Black boys and Black men, in particular, run the gauntlet of a specific
> brand of racism, at the sharp intersection of race and gender.

300.    In a November 15, 2020 *Law360* article by Jason Wu entitled, "Countering Racial

Bias in Courts Requires Bold Change,"

(https://www.law360.com/articles/1324728/countering-racial-bias-in-courts-requires-

bold-change) the author observed:

> Many courts have begun exploring the role of implicit bias and how it
> shows up in judges, court personnel, juries and other actors within the
> court system.
>
> *… Racism is systemic and it operates across institutions, like the courts
> and criminal legal system. It is embedded in our laws and in our
> culture.*

301.    In a related article by the *Saint Paul Legal Leger* and *Minnesota Lawyer,* titled,

"Lessons in Historical Trauma," (https://minnlawyer.com/2020/10/12/lessons-in-

historical-trauma/) dated October 12, 2020, Kevin Featherly quotes a behavioral

consultant named Sam Simmons, who told Minnesota law makers that:

> Racial oppression is a traumatic form of interpersonal violence, *which
> can lacerate the spirit, scar the soul and puncture the psyche,*"
> Simmons said.

 And that:

> "*Justice will not be served*," Simmons told committee members, "*until
> those who are unaffected are as outraged as those who are.*"

302.    Plaintiff has established and plausibly demonstrated that he is being treated

differently because of impermissible considerations, such as his race and intent to

inhibit or punish the exercise of constitutional rights, or a malicious or bad faith intent

to injure him.

303.    Plaintiff contends that he has been treated less well, at least in part because of his protected characteristics, and avers that unlawful discrimination is one of the motivating factors, even if it was not the sole motivating factor, for his unequal treatment. Therefore, he has plausibly alleged facts that clearly shows discriminatory animus.

304.    Plaintiff is similarly situated to Mr. Wilson with respect to the cross complaints of ethics violations in this matter. The only immutable characteristic between the parties is the color of their skins and their ethnic origins – white (Caucasian) and black (African American). In the political asylum context, the BIA and federal courts agree that *"Persecutors are hardly likely to provide their victims with affidavits attesting to their acts of persecution." Bolanos-Hernandez v. INS.* 767 F.2d 1277, 1285 (9th Cir. 1984).

305.    The ethics complaints arose from the same *Onofre* litigation as well as the same nucleus of operative facts. The only plausible explanation for the disparate treatment being inflicted on Plaintiffs is that Mr. Wilson is immunized and afforded "racial privilege" by Ms. Halloran in violation of Plaintiff's civil rights guaranteed to him by the venerable United States Constitution.

306.    Ms. Halloran is presiding over an unjust investigation founded on racial animus, thereby violating Plaintiff's right to due process and equal protection of the laws, and to a fair and impartial investigation and tribunal.

307.    Plaintiff has incurred substantial attorney's fees and spent hundreds of primetime billable hours – in excess of half a million dollars ($500,000.00, to be established at trial) - in defending the frivolous and vexatious *Onofre* lawsuit (District Court, Court

of Appeals and Supreme Court), and spurious ethics complaints of Mr. Wilson, as well as fending off the continuing oppressing investigation of Ms. Halloran.

308. Ms. Halloran tossed the credible complaint of Plaintiff against Mr. Wilson et. al. and continues to viciously prosecute and/or persecute Plaintiff for no other reason other than his race and the exercise of his Constitutional rights to free speech.

309. An attorney's license is a valuable property right under Federal and Minnesota Law, and is entitled to Constitutional protection. Ms. Halloran deliberately calculated to encourage Mr. Wilson et. al. – a pretentious gang of mediocre lawyers and personalities – to aid her unlawful endeavor to trample Plaintiff's civil rights.

310. Due to funding and political considerations, the State Courts are strongly biased in favor of the actions of the OLPR/LPRB, the prosecutor in all disciplinary proceedings.

311. The wrongful, arbitrary, capricious, and unconstitutional actions of Ms. Halloran, while acting under color of Minnesota State law, are numerous and varied in this matter. Ms. Halloran will continue to violate the constitutional rights of Plaintiff with impunity because there is no accountability for her actions under the state court system.

312. No compelling state interest or even rationale basis exists to justify Ms. Halloran's wrongful actions designed to impact Plaintiff's license to practice law and his livlihood. This defensive lawsuit is brought for vindication of civil rights and restoration of good name.

313. The oppressive, abusive, and unlawful manner in which this investigation has been conducted is the brainchild and work product of Ms. Halloran, even though OLPR Director Susan Humiston ultimately signs off and stands by this discriminatory and unlawful conduct. Therefore, Plaintiff seeks equitable relief from this court from the

intential and blatant denial of his Constitutional rights by Ms. Halloran and
OLPR/LPRB.

## CAUSES OF ACTION UNDER FEDERAL LAW

### Count 1: Racial Discrimination Based on Race or Ethnicity in violation of 42 U.S.C. § 1981 (Against Defendants, OLPR/LPRB, and Associated Named Individuals)

314.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every
allegation contained in each of the preceding paragraphs as though fully set forth herein.

315.    Intentional race discrimination by OLPR and Ms. Halloran in conducting
investigations of ethics violations is prohibited under 42 U.S.C. § 1981. Ms. Halloran
engaged and continue to indulge in intentional discrimination on the basis of Plaintiff's
race, color, & ethnicity. She acted and continues to act with reckless or careless
indifference to Plaintiff's right to be free from discrimination.

316.    By the acts and practices detailed in this complaint, Defendants discriminated and
continue to discriminate against Plaintiff on the basis of his race in violation of 42
U.S.C. § 1981.

317.    Defendants intentionally discriminated against Plaintiff and have continued to do
so with malice or reckless indifference to Plaintiff's rights. Defendants' discriminatory
acts and practices are willful, wantonly negligent or reckless, amounting to a conscious
disregard of Plaintiff and Plaintiff's right to Constitutional protection.

318.    Defendants by immunizing via complicit silence the vexatious litigation and
incessant attacks against Plaintiff by Mr. Wilson over the years have encouraged his
unethical behavior, so much that it should be deemed to rise to the level of constructive
conspiracy and/or complicity. The ultimate illegal purpose is to deprive Plaintiff of his

property interest in his law license without due process of law and infringing upon his

free speech rights in violation of the First Amendment.

319.     The conduct of the Defendants is motivated by racial animus towards Plaintiff, and

by their desire to injure, oppress, threaten, terrorize, and intimidate Plaintiff. Plaintiff

has had to spend a substantial amount of his firm's resources responding to the frivolous

*Onofre* lawsuit and multiple baseless ethics complaints brought by Mr. Wilson et. al.

under the enabling environment afforded him by Ms. Halloran.

320.     As a result of Defendant's discriminatory acts and practices, Plaintiff has suffered

and continues to suffer harm and substantial economic losses, impairment to his good

name and professional reputation, and emotional harm and psychological trauma.

## Count 2: 42 U.S.C. § 1983 - Violation of First and Fourteenth Amendments to the United States Constitution's Free Speech Rights (Against Defendants, OLPR/LPRB, and Associated Named Individuals)

321.     Plaintiff repeats, realleges, adopts, and incorporates herein each and every

allegation contained in each of the preceding paragraphs as though fully set forth herein.

322.     Plaintiff has a protected right to Free Speech, as guaranteed by the First

Amendment to the United States Constitution, and made applicable to the States

through the Fourteenth Amendment. Based upon the foregoing, through 42 U.S.C. §

1983, Defendants have violated Plaintiff's First and Fourteenth Amendment rights.

323.     The First Amendment prohibits laws that abridge Freedom of Speech. Speech is

not unprotected merely because it is authored by "professionals." (NAACP c. Button,

371 U.S. 415, 438 (1963); but cf. id. At 439 *("[A] State may not, under the guise of*

*prohibiting professional misconduct, ignore constitutional rights.")*

324.    U.S. Supreme Court precedents have long protected the First Amendment rights of professionals. *The Court applies strict scrutiny to content-based laws that regulate the non-commercial speech of lawyers because regulation of professional speech has been used in the past to increase state power and suppress minorities* (see *National Institute of Family and Life Advocates, DBA NIFLA et al., v. Xavier Becerra, Attorney General of California, et al.*)

325.    States cannot choose the protection that speech receives under the First Amendment, as that would give them a powerful tool to impose, "invidious discrimination of disfavored subjects." *Cincinnati v. Discovery Network, Inc*., 507 U.S. 410, 423 – 424 n. 19 (1993). Defendant's above-described conduct violated and continues to truncate Plaintiff's right to Freedom of Speech under the First Amendment to the United States Constitution.

**Count 3: 42 U.S.C. § 1983 - Violation of Fourteenth Amendment Procedural Due Process Rights (Against Defendants, OLPR/LPRB, and Associated Named Individuals)**

326.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

327.    Plaintiff has a right to seek judicial review of Ms. Halloran's decision to continue its oppressive investigations against him that are predicated on fabricated evidence and lies, as guaranteed by the Procedural Due Process rights in the Fourteenth Amendment of the U.S. Constitution. The abusive investigations of Defendants are the result of racial animus and other prejudices they harbor against Plaintiff. Based on the foregoing, through U.S.C. 42 § 1983 Defendants have violated Plaintiff's Fourteenth Amendment Due Process Rights and rights to Free Speech.

**Count 4: 42 U.S.C. § 1983 - Violation of Fourteenth Amendment's Substantive Due Process Rights (Against Defendants, OLPR/LPRB, and Associated Named Individuals)**

328.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

329.    There is a clearly established due process right not to be subjected to false accusations or false evidence that was deliberately fabricated, such that a reasonable person in Defendant's situation would know it is unlawful to use fabricated evidence, use fabricated testimony, and/or use testimony of manipulated witnesses to prosecute Plaintiff. Defendant acting under color of state law did these things without proper justification, authority, cause, or exigency.

330.    Plaintiff has a substantive Due Process right in his law license, and to be able to practice law with peace of mind, dignity, and tranquility, without having his law license threatened by an unfounded, unconstitutional and oppressive investigation.

331.    The conduct of Defendants is motivated by racial animus toward Plaintiff, and their desire to injure, oppress, threaten, terrorize and intimidate Plaintiff. Plaintiff, an honest and hardworking attorney, has had to expend a tremendous amount of his firm's resources, including his billable time and those of his associates and assistants in responding to the various meritless ethics Complaints of Mr. Wilson, the *Onofre* litigation and Ms. Halloran's investigation. Based on the foregoing, through 42 U.S.C. § 1983, Defendants have violated Plaintiff's Fourteenth Amendment Substantive Due Process rights.

**Count 5: 42 U.S.C. § 1983 –Violation of Plaintiff's Fourteenth Amendment Right to Equal Protection (Against Defendants, OLPR/LPRB, and Associated Named Individuals)**

332.     Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

333.     "[T]he Constitution prohibits selective enforcement of the law … [and] the constitutional basis for objection to intentionally discriminatory application of laws is the Equal Protection Clause…" *Johnson v. Crooks*, 326 F.3d 995, 999 (8th Cir. 2003) (quoting *Wren v. United States*, 517 U.S. 806, 813 (1996). "No State shall make or enforce any law which shall… deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV.

334.     Plaintiff is similarly situated as Mr. Wilson et. al. relative to the cross-ethics complaints. Despite their otherwise similar situation, Ms. Halloran declined to pursue and dismissed several of Plaintiff's complaints outright, and shortly thereafter dismissed the major complaints against Mr. Wilson and Mr. Gavigan without investigation.

335.     Plaintiff credibly alleges Defendants deprived and continues to deprive him of Equal Protection under the law in contravention of § 1983 when they unfairly dismissed his complaint against Mr. Wilson and his associates and have continued to oppressively investigate Plaintiff. This is selective enforcement, pure and simple, and Plaintiff has demonstrated he was treated differently because of impermissible considerations, such as race, intent to inhibit or punish the exercise of Constitutional rights, or malicious/bad-faith intent to injure him.

336.     Selective enforcement is prohibited, and the disparate treatment meted out to Plaintiff demonstrates discriminatory effect. The actions and/or inactions of Ms. Halloran infringed upon Plaintiff's right to Equal Protection under the law. Plaintiff's

right to Equal Protection was denied on account of his race, and on account of his choosing to exercise his fundamental right to Free Speech before OLPR in 2007 and the Minnesota media in 2013. Plaintiff suffered and has continued to suffer serious harm as a direct and proximate result of these Defendants' actions and/or inactions.

337.    Plaintiff has an Equal Protection right to be treated the same as all other similarly-situated attorneys who have filed complaints, or who have had complaints filed against them. Ms. Halloran's outright refusal to fairly investigate Plaintiff's complaint against Mr. Wilson et. al. assures that Plaintiff would not be treated the same as others. Based on the foregoing, Ms. Halloran and OLPR are liable as state actors and constructive co-conspirators because of their complicit silence in support of Mr. Wilson et. al. in violation of Plaintiff's Due Process and Equal Protection rights and causing him emotional injury.

338.    Defendants committed the above-cited conduct, which qualifies as extreme and outrageous conduct. Defendants intended and still intends to cause Plaintiff extreme emotional distress, and to terrorize him. Plaintiff has encountered serious stress and extreme fear of loss of livelihood, because the powers of Ms. Halloran and the OLPR/LPRB emanates from the State Supreme Court. Defendants' animus towards Plaintiff has lead to an intent, not only to harm Plaintiff, but to prevent him from operating his law practice in violation of his Constitutional rights.

339.    Defendant's conduct, practices, policies, and customs as alleged in this Complaint have violated and continue to violate rights guaranteed to Plaintiff by 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, which prohibits the state from discriminating against individuals on the

basis of race. This is injustice that burns in the heart, soul, and spirit and is of the type that Plaintiff never fathomed could happen in broad daylight in this great United States of America.

**Count 6: First Amendment – Unlawful Retaliation for Exercise of Free Speech Pursuant to 42 U.S.C. § 1983 (Against Defendants, OLPR/LPRB, and Associated Named Individuals)**

340.     Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

341.     Defendants with unadulterated impunity violated and continues to violate Plaintiff's First Amendment rights guaranteed by the United States Constitution by retaliating against him for exercising said First Amendment right to Free Speech. Defendants' unlawful actions continue to cause Plaintiff emotional distress, deprivation of his constitutional rights, damage to his professional reputation and material loss.

342.     By the above-described acts, Defendants have continued to penalize Plaintiff for exercising his clearly established right to speak out in the face of oppression and to be denied his right to be free from retaliation in the form of harassing investigative proceedings motivated by his exercise of his Right to Free Speech as guaranteed under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution.

343.     The Defendants' unlawful and outrageous conduct has proximately caused Plaintiff to suffer emotional distress, embarrassment, humiliation, public scorn, permanent loss of reputation, financial injury, loss of income and earning capacity, and to incur other astronomical costs associated with the commencement of this lawsuit.

**Count 7: Violation of the Fourth and Fourteenth Amendments – Equal Protection – Claim under 42 U.S.C. § 1983 (Against Defendants, OLPR/LPRB, and Associated Named Individuals)**

344.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

345.     The Fourth Amendment to the United States Constitution, which is applicable to the states through the Fourteenth Amendment prohibits unreasonable searches and seizures.

346.    Defendant Ms. Halloran acted oppressively and unlawfully in threatening to serve an investigative subpoena on Plaintiff unless Plaintiff turned over bank records that spans a period of five years that are irrelevant to the proceedings, extremely burdensome and calculated to aid her abusive "fishing expedition".

347.    Defendants conduct violated clearly established constitutional rights to be free from unreasonable searches and seizures.  This violation is redressable under 42 U.S.C. § 1983.

**Count 8: Abuse of Power, Abuse of Process, Malicious Prosecution and Constructive Conspiracy and/or Complicity Claim (Against Defendants, OLPR/LPRB, and Associated Named Individuals)**

348.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

349.    Defendants, acting in their individual and official capacities, have maliciously pursued an oppressive investigation against Plaintiff's based on a fabricated complaint and false evidence. In pursuing this torturous investigation they acted intentionally and maliciously because Mr. Wilson et. al.'s Complaint is without merit. The spectrum of Defendants' malfeasance related to Mr. Wilson's unethical conduct over the years ranges between tacit complicity to constructive conspiracy. As a direct and proximate

result of these Defendant's actions Plaintiff has suffered and will continue to suffer economic injury, emotional injury, loss of privacy, and irreparable harm to reputation.

350.     Defendants have wrongfully, unlawfully, and with deliberate indifference to the constitutional rights of Plaintiff, and with utter disregard of their duties and obligations to Plaintiff, acted, practiced and/or adopted policies, practices, procedures, and/or customs which are in violation of the Constitutional rights of Plaintiff. OLPR/LPRB's silence and tacit complicity pertaining to Mr. Wilson et. al. has done untold violence to Plaintiff's hard earned professional life and reputation, and egregiously violates his civil rights in multiple ways.

351.     Defendants, possessing final authority, failed to use properly established policies, procedures, training, supervision and oversight to ameliorate the unlawful practices of Ms. Halloran. They acted with deliberate indifference in implementing a policy of inadequate training and/or by failing to properly train its Assistant Director Amy Halloran to respect the Constitutional protections guaranteed to Plaintiff, including those under the Fourth and Fourteenth Amendments.

352.     Defendants have failed to acknowledge their improper, unlawful, and unconstitutional practices, conduct, and policies in the ongoing investigation. They have not changed or modified such actions, conduct and/or policies to conform to law despite several requests and pleas to do so.

353.     These Defendants' wrongful and unlawful conduct, actions and/or polices, unless and until forced to promulgate policies, by order of this Court, will cause, and continue to cause, great and irreparable injury to Plaintiff, with deliberate indifference to their

duties and obligations under federal law, including those under the Fourth and Fourteenth Amendments as alleged herein.

**Count 9: Violation of Fifth and Fourteenth Amendments - Unconstitutional Deprivation of Liberty and Property Without Due Process Pursuant to 42 U.S.C. § 1983 (Against Defendants, OLPR/LPRB, and Associated Named Individuals)**

354.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

355.    By the above-described acts, including infringement on Plaintiff's rights to free speech, freedom of thought, freedom of opinion, freedom to draw inferences and deduction, and right to engage in permissible legal advocacy in defense of self, Defendants caused Plaintiff to be denied liberty and property in the form of wasted firm resources in fending off and/or defending against Ms. Halloran's crippling investigations being conducted without due process of law, violating the clearly established rights generated under the Due Process Clause of the United States Constitution, the Fifth and Fourteenth Amendments, and 42 U.S.C. § 1983.

356.    The Defendants' unlawful conduct has proximately caused Plaintiff to suffer and continue to suffer emotional distress, embarrassment, humiliation, permanent loss of reputation, financial injury, loss of income and earning capacity, and to incur astronomical costs associated with the commencement of this federal lawsuit.

357.    Defendants' pattern, practices, and customs as alleged in this Complaint have violated and continue to violate the Plaintiff's Constitutional rights under the Fifth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment.

**Count 10: Vexatious Litigation, Unbridled Violation of Ethics Rules, and Abuse of Legal/Court Process (Against Mr. David Wilson, Wilson Law Group, Ms. Cassondre Buteyn, Mr. David Gavigan, Ms. Eva Rodelius, and Mr. Brian Aust)**

358.    Plaintiff repeats, realleges, adopts, and incorporates herein each and every allegation contained in each of the preceding paragraphs as though fully set forth herein.

359.    The above-described acts by Mr. Wilson et. al., is tantamount to vexatious litigation. Mr. Wilson's actions are frivolous and harassing, and a look at the false content and number of filings is an indicia of his bad faith and the frivolousness of his claims. His constant attacks, ethics complaints, and civil suit in the *Onofre* matter are numerous and patently without merit. This demonstrates the utter frivolousness and harassing nature of Mr. Wilson's complaints and litigation activities.

360.    Mr. Wilson et. al. will likely continue with his abusive tactics of filing frivolous lawsuits and ethics complaints to OLPR against Plaintiff unless and until this Honorable Court enters a declaratory judgment that will militate strongly in favor of limiting his ability to engage in future abusive and frivolous complaints and litigation against Plaintiff.

361.    Plaintiff has incurred substantial financial losses, including expending hundreds of primetime billable hours – in excess of half a million dollars ($500,000.00 – to be established at trial) - in fending off the frivolous and vexatious *Onofre* lawsuit (District Court, Court of Appeals and Supreme Court), and spurious ethics complaints of Mr. Wilson et. al., as well as fending off the continuing oppressing investigation of Ms. Halloran.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court issue a protective declaratory judgement order in favor of Plaintiffs against all Defendants, providing for the following relief:

1. Declaring that the acts and practices complained of herein are unlawful and violate Plaintiff's Constitutional Rights, and enjoining any further violations of Plaintiff's Constitutional rights.

2. Declaring that OLPR/LPRB and Ms. Halloran's actions and/or inactions, including its racially discriminatory disciplinary investigations, practices and procedures violate rights guaranteed to Plaintiff by 42 U.S.C. § 1983, and the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

3. Declaring that the OLPR/LPRB and Ms. Halloran, by the process they have employed in this matter, violates the Procedural Due Process Clause of the Fifth and/or Fourteenth Amendment; violates the Substantive Due Process Clause of the Fifth and/or Fourteenth Amendments; violates the Equal Protection Clause of the Fourteenth Amendment; and violates the right to Freedom of Speech of the First Amendment.

4. Enjoin OLPR/LPRB and Ms. Halloran, their agents, employees, and all others in active concert or active participation with them from discriminating on account of race or color against Plaintiff.

5. Require OLPR/LPRB and Ms. Halloran to take all necessary and appropriate affirmative steps to correct, to the extent practicable, the continuing effects of their past and present discriminatory practices.

6. Declaring that Mr. Wilson, named Wilson Law Group associates, and purported expert witness Brian Aust engaged in vexatious litigation, and that Mr. Wilson et.

al. filed false ethics complaints and violated a plethora of ethics rules, some of which are immediately sanctionable by Minnesota OLPR without further investigation.

7. Directing OLPR and Ms. Halloran to initiate and properly conduct ethics investigations against David Lee Wilson, Michael Gavigan, Cassondre Buteyn, Eva Rodelius, and Brian Aust for ethics violations or appoint an independent and/or impartial ethics professional or investigator to do same if this Honorable Court deems it appropriate.

8. Directing OLPR/LPRB and Ms. Halloran to cease and desist from further harassing and oppressing Plaintiff by continuing investigations, predicated on a spurious complaint of Mr. Wilson, that is only supported by lies and fabricated evidence.

9. Issue professional sanctions against David Lee Wilson, Michael Gavigan, Cassondre Buteyn, Eva Rodelius, and Brian Aust because they have engaged in a blatant and vexatious multiplication of proceedings in violation of 28 U.S.C. § 1927 (see *Steinle v. Warren*, 765 F.2d 95 (7th Cir. 1985).

10. Issue financial sanctions against David Lee Wilson, Michael Gavigan, Cassondre Buteyn, Eva Rodelius, and Brian Aust pursuant to Rule 11, Fed. R. Civ. P. in an amount ($500,000.00 – to be established at trial) sufficient to make Plaintiff whole relative to the amount of firm resources he has expended fending off Mr. Wilson's vexatious *Onofre* litigation, frivolous ethics complaints, and in bringing this legal action.

11. Grant an award of reasonable attorneys' fees, non-taxable expenses and costs pursuant to 42 U.S.C. § 1988, or under any other relevant attorney fee statute. [*An*

*attorney who represents himself in a successful civil rights action may not be awarded a reasonable attorney's fee as part of the costs under the civil rights attorney's fees award Act (42 U.S.C. § 1988). However, Plaintiff requests an exception under the peculiar circumstances of this matter where the OLPR/LPRB is a Defendant which makes it nearly impossible for Plaintiff to find and hire a lawyer to represent him. This is simply because of the dreadful reluctance on the part of lawyers to engage and/or antagonize the OLPR/LPRB on behalf of a client for fear of retaliation. This is a good faith plea to make an exception or to change existing law due to special circumstances that does not run afoul of the rationale for this rule. Plaintiff nevertheless acknowledges that the same result could be achieved through financial sanctions pursuant to Rule 11, Fed. R. Civ. P. as this Honorable Court may please.*]

12. Such other relief as the court deems just and proper.

Date:   January 13, 2021                                    Igbanugo Partners Int'l Law Firm

/S/ Herbert A. Igbanugo, Esq.
Herbert A. Igbanugo, Esq.
Attorney #191139
*Pro Se*
250 Marquette Ave, Suite 1075
Minneapolis, MN 55401
higbanugo@igbanugolaw.com
Phone: 612-746-0360
Fax: 612-746-0370